JUDGE FURMAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

BERTA MORALES,

                    Plaintiff                    **17 CV 7414**
                                                 DOCKET NO.

          -against-                              COMPLAINT

                                                 *JURY TRIAL DEMANDED*

THE DEPARTMENT OF EDUCATION OF
THE CITY OF NEW YORK,

                    Defendant

_____x

PLAINTIFF BERTA MORALES, proceeding Pro Se, as and for her Summons and Complaint filed to protect her Constitutional rights against the above-captioned Ddefendant, alleges upon knowledge as to her own facts and upon information and belief as to all other matters:

### PRELIMINARY STATEMENT

1.This is a civil action seeking injunctive relief, monetary relief,  including past and on-going economic loss, compensatory and punitive damages, costs and fees for violations of Constitutionally protected rights brought pursuant to:  Defendant's violations of 42 U.S.C. Section 1983, First, Fourth, and Fourteenth Amendments to the United States Constitution, in particular the Equal Protection Clause, Rehabilitation Act 29 U.S.C.S. Section 794 and 29 U.S.C. Section 701, et seq., as well as State law claims codified in the New York State Constitution as well as in the New York Civil Practice Law and Rules ("CPLR") and Education Law §3020-a (the "tenure law") as they relate to: evaluation and ratings, malicious prosecution, and retaliatory actions taken against Plaintiff as a tenured teacher in violation of the Collective Bargaining Agreement of the United Federation of Teachers ("UFT"), abuse of process, and public policy. Defendant harassed Plaintiff, caused her financial hardship and emotional distress, all by filing frivolous charges pursuant to rules listed by them as relevant to Education Law Section 3020-a, placing her on the Ineligible/Inquiry or "no hire" List, with conscious disregard for Union rights, tenure, and lawful procedures pursuant to Education Law 3020-a.

2. Plaintiff BERTA MORALES' first employment was tutoring her peers, high school students in 1990-1991. She graduated from Fordham University in 1997. In November

of 2000 Petitioner accepted a position as a bilingual special education teacher at P.S 2 with Defendant the New York City Department of Education ("NYCDOE" or "Department" or "Defendant"). Two years later she was transferred to P.S. 70, where she remained until April 2015 when the termination decision of Arbitrator Mary O'Connell took effect.

3. From April 2015 to the present, Plaintiff has been continuously harmed by the errors of law and arbitral procedures used by the Department in omitting a vote on the 3020-a charges without any justification or explanation, the termination without any facts, and the financial hardship and emotional distress of having her fingerprints flagged by the "no hire" list, or "problem code" note on her fingerprints at the NYC department of Education Office of Personnel Investigations.

4. At all relevant times, the NYCDOE has overseen the NYC system of public schools located throughout all five (5) boroughs of the City of New York and been and continues to be a recipient of substantial federal funds, and as such, is subject to the mandates under the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq., (the "Rehabilitation Act"), and Section 503 of the Americans with Disabilities Act, 42 U.S.C. § 12203 (the "ADA"), which prohibits retaliation against individuals, such as plaintiff herein, for her opposition to defendant's discriminatory acts against disabled special education students (or "SE students") and for her advocacy on behalf of disabled students.

Specifically, Section 504 of the Rehabilitation Act, or 29 U.S.C.A. § 794(d), expressly incorporates the anti-retaliation provision of Section 503 of the Americans with Disabilities Act, 42 U.S.C. § 12203, et seq., which prohibits defendants from retaliating against "any individual" because he or she opposes any act or practice made unlawful by the act. See, 42 U.S.C.A. § 12203. See EXHIBIT 1, letter written by former U.S. Attorney Preet Bahara sent to NYC Department of Education General Counsel Courtenaye Jackson-Chase citing violations of law protecting the rights of Special needs children who attend public schools in New York City. Plaintiff was harmed because she questioned the lack of services for her students.

5. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 as this matter involves federal questions.

6. This action's venue properly lies in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391, because the headquarters of the New York City Department of Education is located at 52 Chambers Street, Manhattan.

7. This Court has the power to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

8. This Court has supplemental jurisdiction over Plaintiff's state and city law claims under 28 U.S.C. § 1367.

9. At all times relevant herein, Plaintiff was a public employee of Defendants within the meaning of New York State Civil Service Law § 75-b(1)(b).

10. Plaintiff, a tenured teacher, was harassed and denied support for freedom from abuse of process and malicious prosecution, stigma plus character defamation and from the intentional infliction of emotional harm. Specifically, Plaintiff alleges that Defendant, with flagrant disregard for her Constitutionally protected rights as a tenured teacher, wantonly, recklessly, maliciously, knowingly and purposefully, acting *ultra vires* individually under a ministerial cloak and in conspiracy with each other under color of state law, has deprived Plaintiff of her protected rights and enjoyment of liberty and property before, during, and after the mandatory arbitration known as "3020-A". Her career and personnel file were automatically flagged with a "no hire" code without any notice and in violation of her due process rights, based solely on the opinion of the principal of her school by whom she was targeted. This is tortious interference with contract.

11. Plaintiff was never permitted to participate in the choosing of the arbitrator for her 3020-a due to the fact that in New York City, and not in any other school district in the State of New York, arbitrators are assigned to cases by the Department of Education, and are assigned to one of the two permanent panels by the Department and NYSUT, every September. These permanent panels of Arbitrators are created and maintained by the Department. NYC Chancellor Carmen Farina holds meetings for the NYSUT and Department Attorneys and Arbitrators wherein she urges them to allow as few witnesses as possible, and to make the final decision (to terminate) as quickly as possible.

12. Arbitrators are assigned to one of two separate panels, either the Administrative Trials Unit ("ATU") or the Teacher Performance Unit ("TPU"), by the Department. This creates a bias which cannot be overcome by the Plaintiff, the former Respondent at 3020-a, and denies the charged employee of his/her due process rights to a neutral arbitrator. Arbitrators receive $1400/day and they all know that they must do whatever the Department wants in order to stay in the very lucrative job as hearing officer.

13. Outside NYC charged employees may participate in choosing the arbitrator for 3020-a, but in NYC this right is taken away. The arbitrator is assigned by the Department of Education for each case. The fix is in before the hearing begins:

The statute in NY State Regulations, Part 82-3.5:

**"82-3.5 Appointment of hearing officer in standard and expedited section 3020-a proceedings.**

(a) Upon receipt of notification of the need for a hearing, the commissioner shall obtain a list of potential hearing officers, together with relevant biographical information from the association. Such list shall consist of individuals selected by the association who are qualified to serve as hearing officers. To be qualified to serve as a hearing officer, an individual shall:

(1) be on the association's panel of labor arbitrators;
(2) be a resident of New York or an adjoining state;
(3) be willing to serve under the conditions imposed by Education Law section 3020-a and this Subpart; and
(4) not be otherwise ineligible to serve pursuant to Education Law, section 3020-a(3)(c)(i).

(b) Within 15 days after receiving the list of potential hearing officers from the commissioner, the parties shall by agreement select a hearing officer and notify the commissioner of their selection."

In the UFT contract, Article 21G(2) is the following:

**"2. . Rotational Panel**
As discussed and agreed upon, all parties would be served better by the implementation of a permanent arbitration panel. The panel members must be agreeable to both sides, however, if the parties cannot agree to a full complement of 20 panel members, additional impartial arbitrators shall be selected by the parties in accordance

with the American Arbitration Association (AAA) procedures (strike and rank method) from list(s) provided by the AAA until the desired number (20) is reached to establish such permanent panel.

Panel members shall serve for a maximum of a one-year term. At the expiration of such term, the parties must agree to have arbitrators continue to serve on the panel, and if not, replacement members will be elected by the method outlined above. Removal prior to the end of the one-year term must be for good and sufficient cause upon mutual agreement of the parties.

Any arbitrator who agrees to serve on the rotational panel must agree to the following terms:

a. Each arbitrator selected to serve on this rotational panel must agree to provide five (5) consecutive hearing dates per month for the months of September through June and two (2) hearing dates for the months of July and August. Consecutive days may be construed to mean five (5) dates within two (2) weeks unless otherwise agreed.

b. Arbitrators must provide three (3) dates, within ten (10) to fifteen (15) calendar days from the date the case was assigned to him or her, for a pre-hearing conference. One of the dates shall be at 9:00 a.m. Advocates must accept one (1) of the three (3) dates offered or it will be assumed that the date or dates offered at 9:00 a.m. is (or are) acceptable. Said dates must be in compliance with Education Law §3020-a (within 10 to 15 days from the date selected to serve).

c. At the pre-hearing conference, arbitrators must provide and parties must accept five (5) consecutive hearing dates within the statutory timeframe as delineated in Education Law §3020-a. Consecutive days may be construed to mean five (5) dates within two (2) weeks unless mutually agreed.

d. The parties are committed to having these cases heard in an expeditious manner. For this reason, absent extraordinary circumstances, arbitrators are not to adjourn hearing dates. It should be noted that normally attorney or party scheduling conflicts are not extraordinary circumstances.

e. In all cases, as delineated in Education Law §3020-a the final hearing shall be completed no later than 60 days from the pre-hearing conference and the written decision must be rendered within 30 days from the final hearing date.

f. There is a presumption that charges against the same employee will be consolidated unless the arbitrator finds that to do so would deny a fair hearing. Additionally, in routine matters, any motions must be made and responded to orally. Thereafter, a decision shall be rendered on the issue the same date the motion was made. Should the arbitrator find that written motion practice is necessary, either party reserves the right to respond orally but in no case shall motion practice take place outside the scope of the timelines as outlined in Education Law §3020-a.

Failure to abide by these rules shall be "good and sufficient" grounds for removal of an arbitrator."

There is no mention of the NYC DOE choosing the arbitrator for each case, but indeed, the Department assigns the arbitrators. Plaintiff was not allowed to participate.

14. The standard which must be complied with by the Department in these proceedings is the Just Cause Standard, and there is a reason why two of the 7 clauses mention the "fair" investigation as mandatory. In this case, there was no fair adjudication of the charges made against Plaintiff, because no one submitted any facts concerning the harm done to students and the school, or lack thereof.

See the video and read the transcript of the "secret" meeting held at Department headquarters, Tweed, on February 24, 2015 at:

**The 3020-a Arbitration Newswire: Digging Up The Garbage On the UFT/DOE Partnership of Harm For Charged DOE Employees**
http://nycrubberroomreporter.blogspot.com/2016/05/the-3020-arbitration-newswire-digging_28.html

No private attorney nor Plaintiff were invited.

15. The Arbitrators on the permanent panels in New York City are ordered by the General Counsel to ignore Education Law 3020-a(2)(a) which mandates that there be an Executive Session of the NYC school board, called the Panel For Educational Policy, and a vote by the majority of the members of the Panel on probable cause for bringing the charges to arbitration. Only after this vote in an Executive Session is the list of charges sent to the Respondent-to-be. In New York City, this process never occurs. There is no stop gap to a principal filing charges simply because he/she does not like or want the tenured employee on the school budget.  As there are no senior transfers any longer, the only way for a principal to remove a tenured employee from the school budget is to file 3020-a charges against the individual and hope that at least one if not more, of the charges are found valid. If the employee is exonerated, this employee will be sent back to his/her original position at the school. Arbitrators are told not to allow this.

16. Approximately four years ago, the Department secretly put into place the requirement

that any tenured employee charged with 3020-a and not terminated must become an Absent Teacher Reserve or "ATR". An ATR is a person who works in a different assignment every week or two, as a substitute. No matter what the license of the educator is, he/she must fill in for a teacher who is ill, on sabbatical, or whatever. The process of sending tenured teachers and Guidance Counselors into schools to be substitutes makes no sense unless the bigger picture is reviewed. The Department has made the 3020-a process a weapon to get rid of expensive, and/or older and/or tenured teachers. If, by some chance, the tenured employee wins the 3020-a and is not terminated, an event which the arbitrators are strongly advised to not do, the secret deal is that this employee will not go back to his/her original school....because the principal would be held accountable for losing the case, and the staff would have ample opportunity to make fun of the administration. For this reason, a principal must work closely with the Attorneys of the Department at the District level, to create enough charges to make something, at least one, stick.

17. At all relevant times the NYC DOE has kept the names and personnel file numbers of employees - who have been charged with any number of minor infractions or who have spoken out about wrong-doing by administrators - on a list called the "Problem Code" or "Ineligible Inquiry List". There is no information on the procedures used, no standards for placement on this list, and no method by which a person so placed may remove his/her name from this list. Plaintiff's name was placed on this list because of the actions of the Defendants to leave the special education students without proper resources and services.

18. The invalid and biased decision of Arbitrator O'Connell may be seen in the Department's errors in procedural and substantive due process whereby Plaintiff's tenure rights to fairness and Just Cause were ignored. There was no Just Cause for termination in this case, and O'Connell ignored the improper determination of probable cause in this case as well as the requirement to base any penalty on the standard of progressive discipline. Arbitration is meant to be an alternative to litigation in the courts, so judicial review is generally limited. Section 3020-a and New York Civil Practice Law and Rules (CPLR) Article 75, specify that 3020-a decisions can generally only be overturned if one or more of the following is true:

- There was corruption, fraud or misconduct in procuring the award.

- The arbitrator was not impartial, exceeded his or her power or so imperfectly executed the award that a final award was not made.

- The arbitrator failed to follow the proper legal procedures.

Here, O'Connell made a decision for termination based upon what the Principal "saw" without any facts or student outcomes. There are no facts or statistics in observations, only nonfinal opinions. (Elentuck v Green, 202 A.D.2d 425; 608 N.Y.S.2d 701; 1994 N.Y. App. Div. LEXIS 1956; Appellate Division, Second Department, 1994).

City School District of the City of New York v. McClellan, the Court of Appeals stated, "where, as here, parties are subject to compulsory arbitration, the [3020-a decision] must satisfy an additional layer of judicial scrutiny – it must have evidentiary support and cannot be arbitrary and capricious." 3020-a Arbitration in New York City, particularly as it is practiced in employment law, is an unfair system that is forced or imposed on employees while disregarding their civil rights and liberties in favor of an abbreviated, and at times perverse, form of justice. The New York City Department of Education 3020-a Arbitration lets employers contract around the procedural and substantive protections enjoyed in court. Through an employment contract, an employer can limit or eliminate an employee's access to discovery, shorten the statute of limitations for claims, and create the risk that the plaintiff may have to pay the defendant's attorney fees. All of this happens in a forum that, because of the deferential standard accorded to arbitration awards, is unaccountable to appeal or to the law.

20. Plaintiff was deprived of her procedural rights due to the neglect of O'Connell in recognizing and addressing 3020-a law and the mandate of a vote in an Executive Session to determine probable cause. McConnell went along with the denial of Plaintiff's Motion To Dismiss, because she refused to see that even if the Department's Chancellor Carmen Farina was given the authority to prefer charges against Plaintiff, the Education Law Section 3020-a still mandated a vote on probable cause in an Executive Session before the Plaintiff was served the charges. In NYC there is no Executive Session or vote on probable cause, and no reason why there is no such meeting and vote. In the Plaintiff's case, no reason for this omission by Chancellor Farina was ever given. Neither O'Connell not Judge Chan addressed this omission of law.

21. Nor did the arbitrator grant a request for student test data as required under Education Law 3012-c:

"In May 2010, New York State passed education law 3012-c, mandating significant changes to how educators throughout New York State are evaluated and supported. The law is intended to foster teacher development and create more rigorous, fair and accurate assessments of teacher effectiveness than the previous Satisfactory/Unsatisfactory evaluation system, through the use of multiple measures.

Key Features of 3012-c:

1. All classroom teachers are evaluated annually on a 4-point rating scale (Highly Effective, Effective, Developing, Ineffective)

2. 60% of a teacher's evaluation is based on measures of teacher practice. Under 3012-c, at least half of this 60% must be based on classroom observations using a research-based rubric of teacher practice; additional measures of teacher practice may include student surveys, parent surveys, and teacher portfolios.

3. **40% of a teacher's evaluation is based on measures of student learning.**

4. Teachers receive timely and constructive feedback, including individualized improvement plans for teachers who receive a Developing or Ineffective rating.

The above is posted on "NY State Policy Context", NYC Department of Education, http://schools.nyc.gov/Offices/advance/Background/Policy+Context/default.htm.

21. No data on student learning was presented by the Department as proof of Plaintiff's alleged incompetence. Arbitrators have ruled that teachers brought to 3020-a must be allowed to defend themselves against false and frivolous charges by the submission of student records, grades and outcomes. Island Trees v Butcher, 61 A.D.2d 1011; 402 N.Y.S.2d 626; 1978 N.Y. App. Div. LEXIS 10645, March 13, 1978:

" The court held that any degree of confidentiality accorded to the students' records had to yield to the teacher's right to prepare his defense to the charges made against his reputation and his competence in his profession."

22. It is shocking to the conscience that Arbitrator O'Connell and Supreme Court Judge

Chan agreed Plaintiff should be fired based upon non-final opinions of the principal who was not giving the special needs children in PS 70 a chance to succeed, and wanted Plaintiff removed from the school. In the Matter of Elentuck v Green, 202 A.D.2d 425; 608 N.Y.S.2d 701; 1994 N.Y. App. Div. LEXIS 1956, the NYS Supreme Court Appellate Division Second Department ruled:

"Chancellor's Committee reports, which consist of findings and recommendations regarding personnel actions to be taken by the Board of Education, are prepared to assist the Chancellor and are not binding. Similarly, hearing panel reports relating to N.Y. Educ. Law § 3020-a, which consist of findings and recommendations subject to challenge by an appeal to the State Commissioner of Education, are not binding on either the Board of Education or the Commissioner of Education, and do not constitute final agency determinations. Accordingly, Chancellor's Committee reports and hearing panel reports are predecisional material exempt from disclosure under N.Y. Pub. Off. Law § 87(2)(g). ....lesson observation reports consist solely of advice, criticisms, evaluations, and

recommendations prepared by the school assistant principal regarding lesson preparation and classroom performance. As such, these reports fall squarely within the protection of Public Officers Law § 87(2)(g) (see, Matter of Town of Oyster Bay v Williams, 134 AD2d 267, 268, 520 N.Y.S.2d 599

23. Alarmingly, O'Connell used her own standard of what good teaching was to review Plaintiff's case and conclude a "fair" penalty. Elements of her standard are: rigid adherence to the Workshop Model; removing children from sitting on the rug "too long" (p. 79, opinion); having all lesson plans handed in to a supervisor, etc. None of O'Connell's requirements for "good" teaching are taught or mandated in any pedagogical manual. The proof of learning is in student outcomes, objective data.
Nothing in this ad hoc teaching standard has anything to do with effective teaching, and student outcomes. O'Connell never got to that part.
24. O'Connell had a high standard to meet for a penalty of termination and the record shows that she did not meet the standard of care necessary to justify her award. The burden fell on the New York City Department of Education ("Department") to prove that Plaintiff could *never* be a professional or an acceptable teacher in *any* classroom, *ever again, were proven, and termination was the appropriate remedy.* In other words, despite a stellar career history teaching in a special education classroom, Plaintiff actually was incompetent, and could not control the students in her class, provide any learning at all, ever, and could never provide a minimally acceptable learning experience for students of any age. Principal Kerry Castellano testified that she had given Plaintiff several observation reports where the Plaintiff was given satisfactory ratings. Suddenly, without warning, Plaintiff fell off the pedagogical cliff and became unsatisfactory without any facts behind this turnaround. All of the claims of the Department at the 3020-a were left unproven.
25. O'Connell's conclusion is arbitrary, capricious, and not rational. The hearing itself was a prima facie case of malicious prosecution that had no basis in law or fact. The record evidence shows that Petitioner had a consistent dedication to reaching out to all of the students with disabilities in her ICT classroom. The question remains whether as a matter of law Castellano could find probable cause, and then, as the supposedly did "find" probable cause in the charges, without the support of any law, did Arbitrator O'Connell have subject matter jurisdiction to decide the case? The answer must be no. Before the hearing began, Petitioner filed a Motion To Dismiss For Lack of Subject Matter Jurisdiction To Determine Probable Cause, noticing this Tribunal of the fact that Education Law §3020-a(2)(a) mandated that before charges were served there was supposed to be a vote of the employing board, which never happened. In this matter, the charging papers were signed by P.S. 70 Principal Kerry Castellano, without any Executive Session.
The Arbitrator originally assigned to this case, Attorney Donald Kinsella, denied the

Motion on 3/6/14. The arbitrator who replaced Mr. Kinsella, Attorney Mary O'Connell, agreed with this decision, denied a renewal of the Motion, and proceeded with the hearing on 10/31/14. Petitioner's Constitutional rights to tenure protections were ignored.

26. Without objective standards and unchecked authority leading to violations of the UFT Collective Bargaining Agreement ("CBA") and policies agreed upon by the UFT and DOE, getting a teacher charged is not very difficult. All the administrators with malice have to do is add vague descriptions to the opinions given in observations - true or not - in order to deprive Plaintiff of her protected interest without a lawful statutory finding or factual evidence. Because any performance evaluation scheme contains an implicit definition of good teaching, fair treatment requires that those implicit standards concerning knowledge, competence, and skills be made explicit and known to all teachers, that the measurements of good teaching be valid and reliable and be made by qualified and competent evaluators, and that teachers rated unsatisfactory be given sufficient remedial assistance over time and a reasonable opportunity to correct deficiencies and improve. This did not happen in this case. Without predetermined standards against which teaching performance is to be measured, performance standards

are assembled on an ad hoc basis to suit the circumstances of particular cases or even on a post hoc basis to justify administrative action already taken. The teacher must struggle blindly towards undefined and unknown standards of conduct. The Department's witnesses were clearly unable to judge the performance of Petitioner even if a standard for pedagogy existed. The Department had access to the data necessary to discipline Petitioner, including factual, objective information such as test scores, grades, and measurable student outcomes. The Department chose not to use this objective data. The administration of PS 70 was focused on one goal, to remove Plaintiff from the payroll at the school. This focus was evident most notably with the constant negative comments, observations, and lack of assistance individualized for her alleged "deficiencies". Plaintiff wrote rebuttals to the observations, and still was not given constructive suggestions for improving her pedagogy.

## FIRST CAUSE OF ACTION
### Violation/Interference with Constitutionally Protected Rights – 1st, 4th & 14th Amendments; 42 U.S.C §1983 et seq.; Freedom of Speech and Association; Due Process and Equal Protection Rights;

27. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 26 as though fully set forth herein.

28. The conduct and actions of Defendant in retaliating against Plaintiff and subjecting her to ethical misconduct, violations of due process, and equal rights under the U.S. Constitution and the laws of the State and City of New York, were and continue to be unlawful, oppressive and a malicious attempt to retaliate against her in violation of 42 U.S.C §1983, the First, Fourth and Fourteenth Amendments to the Constitution, Civil Rights Law §75-B, Article I, § 8 of the New York State Constitution, and 28 U.S.C. §1331, 28 U.S.C §1367, Judiciary Codes of Conduct, Judiciary Law §487, and other State law claims so close in definition and effect to the Federal claims brought herein as to be included in this Complaint.

29. Defendant's infringement upon and violation of Plaintiff's rights protected under the statutes listed above was and is intended to harm Plaintiff.

30. Defendant's conduct and actions are intentional, malicious, taken with deliberate indifference and or reckless disregard for the natural and probable consequences., without lawful justification or reason.

31. As a direct result of Defendants actions described herein, Plaintiff has suffered and continues to suffer trauma, emotional distress, mental anguish, loss of income, and loss of

32. As a result of the Defendant's crusade to maliciously harm Plaintiff, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and is entitled to damages sustained to date and continuing with damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Intentional and Negligent Infliction of Emotional Distress , Verbal Harassment, With Unjustified Threats of Future Harm; Section 767 of the Restatement (Second) of Contracts

33. Plaintiff repeats and re-alleges each of the allegations as set forth above in paragraphs 1 through 32 inclusive, of this Complaint, with the same force and effect as though herein fully set forth.

34. Plaintiff was subjected emotional and psychological dangers and intimidation. Plaintiff has been subjected to extreme and outrageous conduct by Defendants, whose intent is to cause – or recklessly disregard the substantial probability of causing – severe

emotional distress; severe emotional distress to the plaintiff is shown to be proximately caused by the Defendants' conduct; damages have been severe. These acts created an unreasonable risk of causing the Plaintiff emotional and physical distress; the Plaintiff's distress was foreseeable; the defendants' conduct was the cause of the Plaintiff's distress; and facts show there is a breach of direct duty of care to the Plaintiff.

35. As a result of this retaliation, intimidation, and abuse, Plaintiff has been irrevocably harmed both emotionally and physically, and demands judgment against Defendants an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### 42 U.S.C. §1983 – STATE AND MUNICIPAL VIOLATIONS; Deprivation of Rights Under Color of Law; Violations of Education Law 3020-a

36. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 35 inclusive, of this Complaint, with the same force and effect as though herein fully set forth.

37. Defendant, acting under color of law, has engaged in a course of action and behavior rising to the level of a policy and condoned practice, and this has deprived Plaintiff of her rights secured by the Constitution and laws in violation of 42 U.S.C. §1983.

38. It can be said that to condone lies, false documentation, retaliation and other such acts is contrary to Municipal Law and Public Officers Law; in this matter, Education Law 3020-a was violated in that there was no proper determination of probable cause.

39. At the Plaintiff's 3020-a arbitration hearing reviewed herein, the New York City Department of Education ("employer") bore the burden of proving the charged misconduct by a preponderance of the evidence, failed to meet this burden, and failed to address the violation of rules, regulations and law pursuant to Education Law 3020-a(2) (a) which requires a vote in an Executive Session by the school board before the [Respondent] received the specifications. Matter of Martin v Ambach, 67 N.Y.2d 975, 502 N.Y.S.2d 991 (1986).

40. As this Executive Session never took place, and as Principal Castellano found probable cause without any authority to do so, Arbitrator Mary O'Connell never had subject matter jurisdiction to proceed with a hearing.

41. As a tenured teacher, Plaintiff possessed a constitutionally protected property interest

being accorded substantive fair hearing and due process rights, as well as a just and fair penalty for proven misconduct. See Cleveland Board of Educ. V Loudermill, 470 U.S. 532, 105 S. Ct. 1487 (1985); Kinsella v Board of Educ. Of Central School District No. 7, 378 F. Supp. 54 (W.D.N.Y. 1974); Matter of Elmore v Plainview-Old Bethpage Central School District, Board of Education, 273 A.D.2d 307, 708 N.Y.S.2d 713, 714 (2d Dep't 2000) (stating that tenured teacher has protected property interest in his position which raises due process considerations whenever teacher is faced with termination); Matter of Soucy v Board of Educ. Of North Colonie Central School Dist. No. 5, 41 A.D.2d 984, 343 N.Y.S.2d 624 (3rd Dep't 1973) (stating that right of tenured teachers to a fair hearing and due process were substantive rights which could not be denied); Ricca v Bd of Ed., New York City 62 A.D.2d 987 (1978).

42. A tenured teacher cannot be disciplined or removed without Just Cause. The "Just Cause" standard encompasses seven (7) elements, all of which must be proven to justify the imposition of discipline upon a pedagogue:

(1) proper and timely notice to the employee of the rules and procedures with which the employee is expected to comply and the possible or probable consequences of the

employee's failure to comply with the rules and procedures;

(2) reasonable rules and orders must not conflict with either a provision of the collective bargaining agreement or with established past practice, reasonably relate to legitimate management objectives, cannot be arbitrary, capricious or discriminatory, and must not purport to control how an employee lives his/her private life;

(3) timely and thorough investigation wherein the employer promptly informed the employee of the charges against her and the employee was given a chance to tell her side of the story before the imposition of disciplinary charges;

(4) fair investigation conducted in an objective manner that gathered and reviewed all relevant facts;

(5) proof of the employer meeting the burden of proving the charges preferred against the employee by a preponderance of the evidence;

(6) equal treatment – the employer applied the rules, procedures, orders and penalties even-handedly and equally to all employees;

(7) penalty – the degree of discipline which the employer seeks to have imposed must be reasonably related to the seriousness of the employee's proven offense and the record of the employee in his service with the employer.

See Enterprise Wire Co., 46 LA 359 (Daugherty 1966); Adolph Coven, Susan Smith, and Donald Farwell, Just Cause: The Seven Tests (BNA Books, 2006).

43. The statute of tenure rights cannot be changed, altered, or in any way abrogated by an arbitrator, thus Defendant did not have the jurisdiction to pursue a 3020-a arbitration, or permit the pursuit of any of the charges alleged in this matter against the Plaintiff. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and is entitled to damages sustained to date and continuing in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### Abuse of Process; Improper Determination of Probable Cause

44. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 43 inclusive, of this Complaint, with the same force and effect as though herein fully set forth.

45. Defendant, conspired to deprive Plaintiff of her First, Fourth, and Fourteenth Amendment rights, and jointly caused such deprivation of rights by acting in concert to unlawfully bring harm, distress, and economic ruin to Plaintiff as described above.

46. Such actions by Defendant denied Plaintiff equal protection under the law, and her rights are guaranteed under U.S.C. §§ 1983, the Fourteenth Amendment of the US Constitution, State and Taylor Law protections.

46. As a result of the Defendant's crusade to maliciously harm Plaintiff, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as

damages for mental anguish and is entitled to damages sustained to date and continuing in an amount to be determined at trial.

Case 1:17-cv-07414-JMF   Document 1   Filed 09/28/17   Page 11 of 25

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court enter judgment and an Order:

(a) declaring that Defendant's acts violated Plaintiff's rights as secured by federal, state, and city law prohibiting retaliation in employment as well as protecting her tenure rights pursuant to the public policy of New York State and the contractual rights under New York City Taylor Law;

(b) Enjoining Defendant from any further acts adversely affecting Plaintiff's name, employment history and charges, rights and privileges;

( c) Compensatory damages to compensate Plaintiff for breach of contract, economic loss, damage to name, profession, career and reputation, pain and suffering, emotional distress and mental anguish, embarrassment, indignity, and dislocation, in an amount to be determined at trial;

(c) Punitive damages against the Defendant;

(d) fees, interest, costs, and disbursements, and

(e) For such other and further legal, equitable or other relief as the Court deems just and proper.

## JURY TRIAL IS DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: September 19, 2017                    Respectfully Submitted,

Berta Morales

21



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street*
*New York, New York 10007*

December 21, 2015

By E-Mail and First Class Mail:
Courtenaye Jackson-Chase
General Counsel
New York City Department of Education
52 Chambers Street
New York, N.Y. 10007

Dear Ms. Jackson-Chase:

The passage of the historic Americans with Disabilities Act of 1990 (the "ADA") reflected a clear and comprehensive mandate to eliminate what had become pervasive discrimination against individuals with disabilities. Physical barriers and public policies had long prevented individuals with disabilities from accessing on an equal basis critically important government services and programs. And nowhere is it more important to tear down the barriers to equal access than with respect to the education of our children. But today, in New York City, 25 years after passage of the ADA, children with physical disabilities still do not have equal access to this most fundamental of rights. Based on the City's own statistics and characterizations of its schools, 83% of public elementary schools are not "fully accessible" to people with disabilities and six of the City's school districts, serving over 50,000 elementary school students, do not have a single school that is "fully accessible" to people with disabilities. Moreover, children with disabilities are frequently denied the experience that many of their peers take for granted: attending their local public school with their friends and neighbors. Instead, starting in kindergarten, these children are often forced unnecessarily to travel outside of their neighborhoods to schools where there are no familiar faces. The result is that children with disabilities and their families are being deprived of the countless meaningful and tangible benefits of being part of their own local school communities, including full and easy participation in after-school and extracurricular activities; attendance without hardship at parent-teacher conferences; reasonable commutes that don't unduly interfere with study, homework, and family time; and natural bonds of friendship and community developed with neighborhood children through playdates and school activities. The costs of this situation are acutely illustrated when a parent so wants a child to go to school in the local zoned school that the parent is willing to go to the child's school several times a day to literally carry the child up and down stairs so that the child can attend classes there. Given this unacceptable state of affairs, we ask the City to provide a response to the findings detailed below that includes the corrective actions the City intends to undertake to begin to remedy its lack of compliance with the ADA.

December 21, 2015
– page 2 –

For the past two years, the United States Attorney's Office for the Southern District of New York has been investigating whether the City of New York has complied with its obligations under Title II of the ADA and the Department of Justice's implementing regulations as they relate to the physical accessibility of public elementary schools, including schools housed in facilities constructed or altered after January 26, 1992.[1] Our investigation found that New York City's elementary schools still are not "readily accessible to and usable by" individuals with disabilities, 28 C.F.R. §§ 35.150 & 35.151, a population which includes not only students, but teachers and family members as well.

Nor has the City complied with the requirements of the ADA even as to alterations that have been undertaken since January 1992, the year that the ADA went into effect. For example, in one elementary school that we examined, the City installed an elevator in 2000, but neglected to make that elevator accessible to people with disabilities in accordance with the requirements specified under applicable federal regulations. As elevator access is almost always a significant logistical impediment to making a building accessible to those with mobility impairments, the City's failure to consider the needs of individuals with disabilities when upgrading and renovating its existing facilities is inexcusable. The City also has failed to make basic, relatively low-cost fixes to its facilities that would help make the schools more accessible.

## A. Our Investigation

As part of our investigation, we reviewed the City's policies regarding the accessibility of New York City schools, including all information available on the New York City Department of Education ("DOE") website and the DOE's Capital Plans, including plans for increasing accessibility. We have also reviewed the City's data regarding the accessibility of schools throughout the five boroughs, the number of children with physical disabilities attending New York City schools, and the distances traveled on buses by such children to attend New York City schools.[2] Further, we interviewed families of children with mobility impairments who either attended New York City elementary schools or who had attempted to enroll in a public school and were discouraged from doing so. Finally, we had an architect who specializes in ADA accessibility visit eleven schools and conduct a thorough examination of each school to identify barriers to accessibility. The sample set of schools included schools in every borough. The schools we selected for examination by the architect were located in school districts with particularly low percentages of accessible schools, according to data provided to us by the City. Of the elementary schools we selected, ten were designated by the City as not accessible and one

---

[1] For purposes of this letter, the term "school" does not include any middle school, high school, pre-kindergarten, vocational, continuing, or adult education programs.

[2] We note that the data regarding the bus distances provided by the City was insufficient to calculate the amount of time the students actually spend traveling to schools, since the amount of time it can take to travel a couple of miles on a school bus can vary widely depending on the bus route and traffic. Although we have asked the City for more information regarding actual travel times, the City has not provided the information to us.

December 21, 2015
– page 3 –

was designated as "functionally accessible." The inspected schools, and the pertinent findings of our architect at each of those schools, are identified in Exhibit A to this letter.[3]

## B. Legal Standard

In enacting the ADA, Congress found that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural . . . and communication barriers, . . . failure to make modifications to existing facilities and practices . . . segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. § 12101(5). Therefore, Congress proscribed not only "obviously exclusionary conduct," but also "more subtle forms of discrimination—such as difficult-to-navigate restrooms and hard-to-open doors—that interfere with disabled individuals' full and equal enjoyment" of public places and accommodations. *Chapman v. Pier 1 Imps. (U.S.) Inc.*, 631 F.3d 939, 945 (9th Cir. 2011).

Title II of the ADA provides, among other things, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.149. The term "public entity" includes local governments. *See* 42 U.S.C. § 12131(1)(A).

Pursuant to Title II and its implementing regulations, a public entity has the obligation to provide access to its services and programs in a manner that does not discriminate against individuals with disabilities. Specifically, pursuant to Subpart B of the regulations, a public entity may not, among other things, provide a person with a disability with an aid, benefit, or service that is not equal to or as effective as that provided to others. *See* 28 C.F.R. § 35.130(b)(1)(i)-(iii). A public entity is also prohibited from providing "different or separate aids, benefits or services to individuals with disabilities than is provided to others unless such action is necessary to provide [such individuals] aids, benefits, or services that are as effective as those provided to others." 28 C.F.R. § 35.130(b)(1)(iv).

With respect to physical access to facilities, Subpart D of the regulations states that "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. § 35.149. The regulations thus require a public entity to "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150. The regulations also specify that in determining how it will provide physical access to its programs, a public entity is required to prioritize methods of compliance that enable it to provide services to persons with disabilities in "the most integrated setting appropriate." 28

---

[3] Although our examination found numerous examples of architectural barriers on each floor of the schools that we examined, Exhibit A does not list those architectural barriers found on the upper floors of such schools, where those upper floors are themselves inaccessible to those with mobility impairments.

December 21, 2015
– page 4 –

C.F.R. § 35.150(b)(1). Moreover, for alterations affecting the usability of a facility commenced after January 26, 1992, a public entity is required to ensure that such alterations are "to the maximum extent feasible . . . readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(a)(1).

Finally, the regulations also require a public entity to make reasonable modifications to policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, unless the public entity can prove that such modification would fundamentally alter the nature of the service. 28 C.F.R. § 35.130(b)(7). Indeed, courts have explained that public entities must ensure that individuals with disabilities are afforded "meaningful access" to that entity's publicly offered services, benefits, and activities, see, e.g., Alexander v. Choate, 469 U.S. 287, 301 (1985), and that the entity will frequently have to make modifications to its policies, practices and procedures in order to avoid discriminating against individuals with disabilities, and to truly afford them "meaningful access." Id.; see also Tennessee v. Lane, 541 U.S. 509, 531 (2004) (noting that the "failure to accommodate persons with disabilities will often have the same effect as outright exclusion").

## C. Findings

The ADA authorizes the Department of Justice to investigate alleged violations of Title II, see 42 U.S.C. § 12133, and the implementing regulations authorize DOJ to conduct compliance reviews of public entities, 28 C.F.R. § 35.172(b). Although our review of the accessibility of New York City's public elementary schools is ongoing, and we reserve the right to supplement our findings, we have reached the following findings of fact and conclusions of law, and propose certain remedial measures, based upon the information we have obtained to date.

### 1. Failure to Make Schools Accessible

First, looking at the public elementary school system in its entirety, we have concluded that New York City elementary schools are not currently "readily accessible to and usable by individuals with disabilities." 28 C.F.R. §§ 35.149, 35.150 & 35.151. Using the City's own figures and definition of "fully accessible" schools, only approximately 17% of public elementary schools are "fully accessible." Districts 3, 5, 8, 12, 16 and 21 do not have any "fully accessible" elementary schools. This abysmally low percentage of schools demonstrates that the City has failed to provide program accessibility to individuals with disabilities comparable to the program accessibility available to individuals without disabilities.[4]

In recognition of the dearth of "fully accessible" elementary schools, the City has designated a number of schools as "functionally accessible." According to the City, a "functionally accessible" school is one which does not meet the requirements of the ADA, and

---

[4] These statistics, and the statistics provided throughout this letter regarding the accessibility of public elementary schools, do not include charter schools or District 75 schools.

December 21, 2015
– page 5 –

thus is not "fully accessible," but nonetheless offers individuals with mobility impairments some level of access to relevant programs and services, including the science laboratory, library, cafeteria, gymnasium, and at least one restroom.

Our investigation has not yet independently examined whether the schools that the City has designated as "fully accessible" comply with the ADA, or whether those schools designated as "functionally accessible" are in fact readily accessible to those with mobility impairments.[5] Indeed, the terms "functionally accessible" and "fully accessible" are not derived from the ADA. We note, however, as discussed later in this letter, that the one school we visited that was designated by the City as "functionally accessible" lacked certain crucial accessible features, raising a serious question as to the accuracy of the City's categorizations. Moreover, the City's definition of functional accessibility does not include accessibility for those with hearing or vision impairments as required by the ADA Design Standards.[6]

However, even crediting the City's categorizations and including those schools that have been designated as "fully accessible" and "functionally accessible," the percentage of accessible elementary schools in New York City is inadequate to provide program accessibility. For example, in the 2013-2014 school year, District 8 had only a single "functionally accessible" school serving a district with approximately 13,000 elementary students. After we alerted the City to our concerns regarding the dearth of accessible schools in District 8 in particular, the City reclassified a school that had previously been designated as "non-accessible" as "functionally accessible," and opened a new "functionally accessible" school within the district. Yet even with these changes, in the current school year (2015-2016) only approximately 20% of District 8 schools provide any level of accessibility.

Similarly, in the current school year, only approximately 21% of the elementary schools in District 16 and 31% of the elementary schools in District 4 are designated as "functionally accessible." Strikingly, 24 of the 32 City school districts have less than a 50% accessibility rate for public elementary schools, even when including schools that the City has designated as "functionally accessible."

---

[5] The City acknowledges that in some of the schools designated as "functionally accessible," "school programs may need to be re-located to accommodate access."

[6] The term "ADA Design Standards" encompasses both the 1991 ADA Standards for Accessible Design (the "1991 Standards") and the 2010 ADA Standards for Accessible Design (the "2010 Standards"). The 1991 Standards, found in Appendix D to 28 C.F.R. Part 36, govern all new construction and renovations under Title II of the ADA from the time period January 26, 1992, through March 15, 2012. Beginning on March 15, 2012, all new construction and renovations under Title II must be performed in accordance with the 2010 Standards. See 28 C.F.R. § 35.151(c). The 2010 Standards consist of the 2004 ADAAG and the requirements contained in 28 C.F.R. Part 36, subpart D. See 28 C.F.R. § 36.104; see also appendices B and D to 36 C.F.R. part 1191 (2009) ("2004 ADAAG"). The architect who conducted the examination of New York City schools identified barriers to access under both the 1991 Standards and the 2010 Standards. Elements that are identified in this letter as not complying with the requirements in the 1991 Standards should be modified to comply with the 2010 Standards. All of the standards and regulations are available at www.ada.gov.

December 21, 2015
— page 6 —

As a result of the lack of accessible schools, students with mobility impairments are often excluded from their local zoned school, the school that their peers in their community all attend. These students may need to spend significant amounts of time traveling to a school that can accommodate their physical disabilities. Requiring elementary students with disabilities to travel extensively at the beginning and end of each school day—a condition which is not imposed upon their peers—can impose particularly onerous physical demands on these children.

In the course of our investigation, we spoke to one family who went to extreme measures to keep their child enrolled in their zoned local school, rather than subject the child to a lengthy commute to the closest "accessible" school. A parent of this elementary school child was forced to travel to the school multiple times a day, every school day, in order to carry her child up and down stairs to her classroom, to the cafeteria, and to other areas of the school in which classes and programs were held.

The City has defended its failure to make a sufficient number of elementary school facilities accessible by pointing to the fact that the thousands of children with mobility impairments who attend public school constitute only a small percentage of the overall student population. We find this explanation unacceptable and inadequate. First, the City's legal obligation to provide program accessibility does not depend upon the number of students with disabilities located in a particular geographic area. *See* DOJ Title II Technical Assistance Manual at II.5.1000. It will always be the case that children with disabilities will be a relatively small percentage of the entire student population. Obviously that cannot be a basis not to comply with the ADA. If even one child has been denied equal access to the City's educational programs on account of a disability, that is one child too many. Second, the City's data does not account for non-students with disabilities who use public school facilities, such as teachers, staff members, parents, grandparents, or other family members of school children who wish to participate in parent-teacher conferences, attend a school performance, or join the PTA. Third, our investigation has revealed that, due to the dearth of accessible elementary school options, some parents are effectively forced to send their children to private schools.[7]

We are aware that the City's most recent five-year Capital Plan includes funds to increase the accessibility of eleven schools, listed under the "Accessibility Program" of the Capital Plan. Those efforts are woefully insufficient. The 2015-2019 Capital Plan includes hundreds of planned physical renovations to schools in addition to the eleven accessibility projects. It is not clear from the Capital Plan, however, whether any of these additional planned physical

---

[7] Further, although we have not to date investigated issues pertaining to District 75, we note that the percentage of students with mobility impairments increases significantly when District 75 schools are included in the analysis. The City has stated that District 75 is designed to serve children with autism, cognitive delays, severe emotional challenges, or sensory impairments. Yet our investigation suggests that some families may have been encouraged to send children with only mobility impairments to a District 75 school, even though these children do not have a condition that would appear to necessitate a District 75 placement. Indeed, according to figures provided to us by the City, almost half of the public school children with mobility impairments ultimately attend District 75 schools, underscoring the severely limited opportunities available to children with mobility impairments and the City's clear failure to meet their needs. We reserve the right to conduct an ADA investigation relating to District 75 at a later date.

December 21, 2015
– page 7 –

renovations—which include "upgrades" to cafeterias, auditoriums, and toilets—will be undertaken in such a way as to increase the accessibility of those areas of the schools as well as the path of travel to those altered areas. Those projects are detailed separately from the eleven projects listed under the "Accessibility Program" of the Capital Plan. Moreover, as described below, the City has consistently failed to comply with the ADA when making alterations or "upgrades" to school facilities. At a minimum, the City must ensure that all planned upgrades and renovations are completed in a manner that complies with the ADA and increases accessibility to school facilities.

## 2. Failure to Comply with the ADA When Making Alterations to Existing Facilities

In every school visited by our architect, we identified alterations made after January 1992 that were not compliant with the ADA. Such alterations included, but were not limited to, fire alarm systems, door hardware, toilet partitions, cafeteria seating, main office counters, library furniture, and playground areas. *See* Exhibit A. The City's failure to make these altered components accessible constitutes an explicit violation of the implementing regulations of the ADA. "Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992." 28 C.F.R. § 35.151(b)(1). The definition of facility includes both "all or any portion of the buildings, structures . . . [and] equipment." 28 C.F.R. § 35.104. The fact that these alterations were made in schools that are not otherwise accessible is no defense for not ensuring that the altered portion of the facility is readily accessible to and usable by individuals with disabilities. "The distinction between the treatment of existing facilities and alterations reflects Congress' recognition that mandating changes to existing facilities could impose extraordinary costs. 'New construction and alterations, however, present an immediate opportunity to provide full accessibility.'" *Civic Ass'n of the Deaf of New York City, Inc. v. Giuliani*, 970 F. Supp. 352, 359 (S.D.N.Y. 1997) (quoting *Kinney v. Yerusalim*, 9 F.3d 1067, 1074 (3d Cir. 1993)). "Thus, while Congress chose not to mandate full accessibility to existing facilities, it required that subsequent changes to a facility be undertaken in a non-discriminatory manner." *Id.* "The more stringent requirements for alterations reflect a belief that it is 'discriminatory to the disabled to enhance or improve an existing facility without making it fully accessible to those previously excluded.'" *Id. Cf. Disabled in Action of Pennsylvania v. Southeastern Pennsylvania Transportation Authority*, 635 F.3d 87, 92 (3d Cir. 2011) ("In other words, if a public entity chooses to make changes rising to the level of "alterations" to a facility, it ordinarily must use that opportunity to make the altered part of the facility accessible, as well."). The City must end its practice of ignoring the ADA when making alterations to schools.

### a. Post-January 1992 Construction of an Addition to a School

The most glaring example of the City's failure to make alterations readily accessible to and usable by individuals with disabilities was the construction of an addition to a school in Queens in 2000. As a result of this addition, the school has been identified by the City as being "functionally accessible." But even though the addition was built ten years after the passage of

December 21, 2015

-- page 8 --

the ADA, it is riddled with inaccessible features. Most strikingly, it has an elevator that is not compliant with the ADA Design Standards, as the elevator is not the required width. *See* Exhibit A; *see also* 2010 Standards §§ 206.6, 406.4.1; 1991 Standards §§ 4.1.3(1), 4.10.9. Moreover, while the school's addition has visual alarms, the visual alarms are not in the classrooms as required. *See* Exhibit A. Other non-compliant features in the addition include bathroom grab bars that are not the appropriate dimensions, door knobs and faucets that require tight grasping and twisting to operate, drinking fountains with inaccessible features, an inaccessible sink in a classroom, and a cabinet obstructing a circulation path. *See id.* Failing to construct the addition as readily accessible to and usable by individuals with disabilities constitutes a violation of the ADA. *See* 28 C.F.R. § 35.151(b)(1).

Further, notwithstanding that the City has designated this particular school as "functionally accessible," the gymnasium is not accessible to those with mobility impairments, as the accessible route is blocked by a half flight of stairs. Moreover, in addition to the issues relating to the building addition noted above, many other post-January 1992 alterations made at this purportedly "functionally accessible" school do not comply with the ADA, including the fire alarm system, the cafeteria seating, the playground area, and the main office counter. *See* Exhibit A. These findings, and other barriers to access that were found at this school, as detailed further at Exhibit A, call into question whether even those schools that are designated as "functionally accessible" by the City are in fact accessible to those with mobility impairments.

### b. Entrances

The City also has failed to add an accessible entrance to those schools that have undergone renovations since January 1992. When making alterations to a facility, the ADA regulations require covered entities to make the path of travel to altered primary areas accessible to the extent the cost of doing so is not disproportionate to the cost of the overall alteration. 28 C.F.R. § 35.151(b)(4). Path of travel accessibility is considered disproportionate when its cost exceeds 20% of the cost of the alteration to the primary function area. When the cost of alterations necessary to make the path of travel to an altered area fully accessible is disproportionate to the cost of the overall alteration, public entities should prioritize certain elements to provide the greatest access to parts of the facility that have been altered to become accessible. 28 C.F.R. § 35.151(b)(4)(iv)(A). The first priority to ensure a path of travel to altered accessible portions of the facility should be an accessible entrance. *See id.* Of the eleven schools we examined, however, only one had an ADA-compliant entrance. Four other schools have an entrance that arguably could be used by some people using wheelchairs, yet these entrances nonetheless have numerous inaccessible features.[8] *See* Exhibit A. These non-ADA compliant features include ramps with slopes that are too steep for wheelchairs to navigate safely, insufficient clear space on the ramps to allow wheelchairs to make turns, changes in level that are not beveled, and ramps with either no handrails or handrails without compliant

---

[8] Furthermore, at schools where the main entrances are inaccessible, the City has uniformly failed to provide signage indicating the locations of an accessible entrance, as they are required to do under the governing regulations. *See* 2010 Standards §§ 216, 703; Exhibit A.

December 21, 2015
– page 9 –

extensions and edge control, rendering them unsafe. *See* Exhibit A. To the extent any of these ramps were constructed after January 1992, the City has violated the ADA by not making them readily accessible and compliant with the ADA Design Standards. *See* 2010 Standards §§ 206.1, 303.3, 405; 1991 Standards §§ 4.1, 4.5, 4.8.[9] In addition, to the extent primary function areas in these schools were altered since January 1992, the City has violated the ADA by not spending an additional 20% of the cost of the alteration on improving the accessibility of these entrances.

The failure of the other altered schools to construct any accessible entrance is even more troubling, as each of these schools has entrances that easily could be made accessible to those in wheelchairs. For example, PS 41 has a street level main entrance that requires only a minor, one inch change in level to render it accessible. Making such alterations to school entrances is a critical step in providing access to the City's public elementary school programs to more individuals with disabilities.

### c. Alarm Systems

Our examination of the sample set of schools also revealed that, in a number of schools, alarm systems had been upgraded or replaced without fully complying with the regulations regarding visible alarms. *See* 2010 Standards §§ 215.1, 702; 1991 Standards § 4.28.1. Specifically, as outlined in Exhibit A, a number of schools have installed visible alarm systems, but failed to install visible alarms in all locations used by students. Failure to properly install visible alarms in all areas of common usage leaves individuals with hearing impairments at risk in the event of a fire or other emergency. Each of the elementary schools that has upgraded or replaced its fire alarm system since January 1992 but has failed to install visible alarms in all common use areas, including in all restrooms, classrooms, and any other room used by students or members of the public, should remedy its violations of the ADA promptly.

### d. Door Hardware

Schools uniformly did not have accessible door hardware. The ADA requires that door hardware must be operable with one hand and shall not require tight grasping, pinching, or twisting of the wrist. *See* 2010 Standard §§ 206.5, 309.4, 404.2.7; 1991 Standards § 4.13.9. It is improbable that none of the schools we visited has changed any of its door hardware in the past 24 years. To the extent that any of the hardware was replaced since January 26, 1992, and hardware was installed that does not meet the ADA Design Standards, the City has violated the ADA. Even if door hardware in elementary schools has not been replaced since the ADA was enacted, updating door hardware so that it can be operated by those with physical impairments is a low cost change the City should make to its public schools to generally increase program accessibility.

---

[9] To the extent any of these ramps were constructed prior to January 1992, the alterations required to bring these ramps into compliance with the 2010 Standards are relatively minor. Yet these changes still have not been made.

December 21, 2015
– page 10 –

### e.  Main Office Counters

A number of schools installed non-ADA compliant counters in their main offices after the ADA Standards for Accessible Design went into effect, as set forth in Exhibit A. Specifically, when installing such counters, the City was required to ensure that either a portion of the main counter or an auxiliary counter had a maximum height of 36 inches. *See* 2010 Standard §§ 227.3, 904.4; 1991 Standards § 7.2(2).  The City's failure to do so violated the ADA.

### f.  Playgrounds

A number of the schools that we surveyed also failed to comply with the ADA Standards for Accessible Design when renovating their playgrounds post-January 1992.  Schools installed seating areas in the playgrounds that were not accessible, and many playgrounds had changes in level that were not beveled or sloped in a manner compliant with the ADA Standards for Accessible Design, as detailed in Exhibit A.  Furthermore, many of the accessible entrances to these playgrounds do not comply with the ADA Standards for Accessible Design, including by having ramps that are too steep or without handrails. *See id.*

### 3.  Program Access and Failure to Make Reasonable Modifications

Our investigation also revealed that the City has failed to undertake ongoing physical and programmatic changes to ensure that its elementary school program, when viewed in its entirety, is accessible and usable by people with disabilities. 28 C.F.R. § 35.150.  In addition, the City has failed to consider requests by students with disabilities for reasonable modifications that would allow those students to attend their zoned school, 28 C.F.R. § 35.130(b)(7), including by failing to assess whether requested modifications would be reasonable in a particular case. Subsequent to the start of our investigation, the City made information regarding accessible schools easier to find on its website, implemented a complaint procedure for families encountering issues with physical accessibility, and assigned an individual to consider individual requests to make alterations at a particular school that could allow a disabled student greater access to school facilities.  We appreciate the City's efforts to increase the information available to parents and to be more responsive to the needs of individuals with disabilities.  However, these efforts fall far short.

We have reviewed the information available on the DOE's website regarding physical accessibility and have not found any reference to a policy or guidelines addressing how decisions concerning particular requests for accommodations will be made.  Moreover, while there is a link to an email address for "general inquiries about accessibility," there is no indication that reasonable modifications are being offered to students with physical disabilities who wish to attend a school that is not listed as either accessible or "functionally accessible."  Parents visiting the DOE website would not be aware of the possibility of requesting such a modification, and may therefore reasonably assume that their child must only attend one of the "accessible" schools.  The City's failure to provide a mechanism for students with disabilities to request a reasonable accommodation violates the ADA. *See* 28 C.F.R. § 35.106.

December 21, 2015
– page 11 –

### D. Minimum Actions Necessary to Remedy Violations

#### 1. Ensure that All Post-January 1992 Alterations and New Construction Comply With the ADA Design Standards

First, as noted above, our investigation revealed that the City has routinely ignored the requirements of the ADA when making alterations to school facilities. The City must end this practice going forward. The City must also remedy its past violations of the ADA by ensuring that all post-January 1992 alterations made to its public school facilities, as well as all new construction since January 1992, comply with the relevant ADA Design Standards. The City must act expeditiously to remedy all violations identified above and in Exhibit A with respect to the schools surveyed in the course of our investigation. The City must also conduct a comprehensive survey, under the supervision of a consultant mutually acceptable to the City and the United States with expertise in the area of ADA accessibility, of its existing facilities to identify other failures to comply with the ADA when making alterations or constructing new facilities, and act to remedy those additional violations.

#### 2. Provide Program Accessibility to the First Floor, Auditoriums, Gymnasiums, and Cafeterias

In addition to remedying its violations with respect to new construction and post-January 1992 alterations, the City must take immediate steps to remedy the systemic accessibility failings in the City's public elementary schools. *See* C.F.R. § 35.150(b) (noting that public entities can comply with the ADA by altering existing facilities in such a way as to make its services, programs, or activities readily accessible to and usable by individuals with disabilities where other methods are ineffective in achieving compliance). As an initial matter, the City must develop a comprehensive plan to survey all elementary schools and recommend a system-wide remediation plan to address the lack of accessibility. The City should make it a priority to increase the accessibility of the first floors of school buildings and the rooms used by all students, teachers, parents, or other visitors to the schools, including making the following accessible: at least one entrance, all classrooms, the auditorium, the gymnasium, the cafeteria, and at least one toilet stall for each sex (for adults and children) or a single unisex toilet room (for adults and children). *See* 28 C.F.R. § 35.151(b)(4)(iv)(A) (describing which elements should be prioritized to provide the greatest access). In passing the ADA, Congress explained that the concept of readily accessible "is intended to enable people with disabilities (including mobility, sensory, and cognitive impairments) to get to, enter and use a facility. While the term does not necessarily require the accessibility of every part of every area of a facility, the term contemplates a high degree of convenient accessibility, entailing accessibility of parking areas, accessible routes to and from the facility, accessible entrances, usable bathrooms and water fountains, accessibility of common use areas, and access to the goods, services, programs, facilities, accommodations and work areas available at the facility." H.R. Rep. No. 101-485, pt. 2, at 117-118 (1990). Many of the required modifications are minor, but the benefits—increasing accessibility for many—are hugely significant in the lives of children, their families, and others who use the schools.

December 21, 2015
– page 12 –

### a. Entrances

As discussed above, the first priority in ensuring that the first floor of a facility is readily accessible to and usable by individuals with disabilities is ensuring that at least one entrance to the school is accessible. To the maximum extent feasible, every New York City school should have at least one accessible entrance. We have concluded that it would be feasible to construct an accessible entrance at each of the elementary schools that we examined, to the extent one did not already exist.

### b. Bathroom on the First Floor

Other than the Queens school that underwent a recent addition, not one of the schools we examined had an accessible toilet room for adults or children on the first floor of the school. . This means that children in wheelchairs are denied accessible bathrooms at these schools. It also means that any family member with a mobility disability attending a school performance or a parent-teacher conference is not able to use a restroom during his or her visit. As noted, providing at least one accessible toilet room on the first floor of every school should be a priority of the City.

### c. Auditoriums

The accessibility of auditoriums is not only important for students, but also for family members and members of the public who assemble in the auditorium throughout the school year for school performances or public events. A parent in a wheelchair should be able to attend his or her child's school performances. Yet every school auditorium we visited lacked basic accessible features. Assembly areas with fixed seats and an audio amplifications system require the provision of an assistive listening system. *See* 2010 Standards § 219; 1991 Standards § 4.1.6(1). Despite this requirement, none of the schools we examined had assistive listening systems available in the auditoriums. Even where there were indications that such a system had been installed, the receiver devices needed to use the systems were not located on school premises. *See* Exhibit A. The regulations further require a certain percentage of seats to be replaced with wheelchair accessible spaces. 2010 Standards § 221; 1991 Standards § 4.1. Yet, although nine of the schools that we visited had auditoriums on an entry level floor, not one had a single wheelchair accessible space in the auditorium. *See* Exhibit A. Finally, although many of the schools we examined use the auditorium stage for student instruction, not a single school that we examined had an accessible route from the seating area to the stage that was compliant with the ADA Standards for Accessible Design. *See* Exhibit A. Again, such accessibility is necessary to provide access to the City's public elementary school program.

### d. Gymnasiums

School gymnasiums are also commonly used for large group events involving family members and children and should therefore be readily accessible to and usable by individuals with disabilities. For about half of the schools we examined, the gymnasiums were on the first floor and could be made accessible by making very minor modifications. Such changes include ensuring that coat hooks and other operable parts are within reach and not obstructed, installing

December 21, 2015
– page 13 –

accessible drinking fountains with accessible controls and with the requisite knee space, addressing obstructions in circulation paths, and providing wheelchair seating in gymnasiums with fixed assembly seating. *See* Exhibit A.

### e. Cafeterias

Cafeterias are also commonly used for large group events involving families and children, and should therefore be readily accessible to and usable by individuals with disabilities. As with gymnasiums, in the overwhelming majority of schools we examined, the cafeterias were on the first floor and could be made accessible through minor alterations. One consistent problem we saw throughout the schools is that, even where new cafeteria tables had been purchased since January 1992, the City had not installed any accessible tables. Consistent with the governing regulations, when the City replaces fixed furniture at schools, the new furniture must be readily accessible to individuals with disabilities. *See* 28 C.F.R. § 35.151(b); 2010 Standards §§ 226.1, 902.2; 1991 Standards §§ 4.1.6(1), 4.1.3(18), 4.32. To the extent any of the furniture does not include fixed seating, such as moveable cafeteria tables, the City is still required to make reasonable modifications to ensure that students with mobility disabilities are able to eat in the cafeteria. 28. C.F.R. § 35.130(b)(7). Other barriers to accessibility in the cafeterias we visited were inaccessible drinking fountains, inaccessible bathrooms, objects protruding into circulation paths, coat hooks that are too high, and insufficient clear openings at entrances to the cafeteria and entrances to food lines. *See* Exhibit A. Most of these barriers to accessibility could be removed with minimal cost to the City.

### 3. Remedy Protruding Objects and Absence of Signage

In every school that we examined, we found wall mounted objects that protruded into circulation paths, in violation of Section 307 of the 2010 Standards. *See also* 1991 Standards § 4.4. *See* Exhibit A. Such protruding objects are a hazard to those who are blind or have low vision, as they can be seriously injured if they cannot detect such objects with the sweep of their canes. The City could easily remedy these barriers to accessibility in its schools by ensuring either that such objects are mounted in accordance with the specifications set forth in the 2010 Standards, or that a fixed element is placed at a cane-detectable height, such as a barrier or other detectable warning system.

Similarly, schools uniformly lacked signage with raised characters that conforms to Sections 216 and 703 of the 2010 Standards, as detailed in Exhibit A. Posting such signage at entrances, exits, stairways, classrooms, and restrooms would not be unduly expensive, and would increase the accessibility of public schools for those with vision impairments. Signage directing persons with mobility impairments to an accessible entrance or restroom, where such entrances or restrooms exist, would also increase the accessibility of schools at a relatively minimal expense to the City.

December 21, 2015
— page 14 —

### 4. Develop a Reasonable Modification Policy to Address the Needs of Children with Physical Disabilities

Students with disabilities must be provided with a mechanism for requesting reasonable accommodations from DOE that would permit them to attend their school of choice, even if such school has not been designated as accessible by the City. DOE should make clear to parents and students that such accommodations may be not only for structural changes to the facility, but could also include non-structural accommodations, such as moving a classroom to the first floor of a school or providing a student with an aide, depending upon the facts of the particular case. DOE should clearly set forth the mechanism for making such requests on its website.

The City should also develop a policy or guidelines for addressing such requests. Where a request would require the removal of architectural barriers, the City should make an assessment as to whether the removal of such architectural barriers is necessary in that particular case in order to provide the benefits of the elementary school program (including benefits to parents, family members and the public, as applicable) in the most integrated setting appropriate. Finally, the policy or guidelines governing requests for reasonable modifications should also be clearly stated on the DOE website.

\*        \*        \*

We request that the City provide a response to this findings letter, including an outline and timeline of the corrective actions the City intends to undertake to begin to remedy its lack of compliance with the ADA, within 30 days. We look forward to your continued cooperation with this investigation.[10]

Sincerely,

PREET BHARARA
United States Attorney

By: _____
LARA K. ESHKENAZI
JEANNETTE A. VARGAS
Assistant United States Attorneys
Tel.: (212) 637-2758/2678

Attachment

---

[10] Please note that this Letter of Findings is a public document and will be posted on the website of the United States Attorney's Office and at www.ada.gov.