UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————— x

BERTA MORALES,

                Plaintiff

                    DOCKET NO. 17-CV-7414 (JMF)

                    OPPOSITION TO DEFENDANTS'
-against-                   MOTION TO DISMISS

NEW YORK CITY DEPARTMENT OF EDUCATION,

                Defendants

——————————————————————— x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6|11|18

PLAINTIFF BERTA MORALES, ("Plaintiff") proceeding Pro Se, as and for her Summons and

Complaint filed to protect her Constitutional rights against the above-captioned Defendants,

alleges upon knowledge as to her own facts and upon information and belief as to all other

matters:

### STATEMENT OF RELEVANT FACTS

Plaintiff 's first employment was tutoring her peers, high school students in 1990-1991. She

was recommended to this program because of her excellent academic performance. She obtained

her high school diploma in 1993 and was admitted into Fordham University. Four years later,

she obtained her bachelor's degree. She decided to enter the education system and started to take

the steps necessary in order to do so. The next two years she took state tests and substituted in

public school. In November of 2000 Plaintiff accepted a position as a bilingual special education

teacher at P.S 2. Two years later she was transferred to P.S. 70, where she remained until April

2015.

1

While in her teaching position, Plaintiff did her job, and did it with care, kindness, and excellence. Plaintiff obtained her master's degree in special education from Mercy College in 2004. Shortly after that, she obtained her permanent certification in special education with a bilingual extension in Spanish. Parents loved her, because a large percentage of the students spoke Spanish, many exclusively.

Plaintiff did, however, bring up the facts showing that the school was not fulfilling their duty of care to the special needs children who were Plaintiff's students. Both resources and services were not being provided by the NYC Department of Education, and this was Noticed to the Department in December 2015 from former U.S. Attorney Preet Bharara to NYC DOE General Counsel Courtenaye Jackson Chase. (See EXHIBIT 1). Plaintiff's speaking out left her a target for retaliation, and this is the motive behind her being charged.

On September 12, 2013, Plaintiff was served with several specifications citing her for incompetency and insubordination (Charging Papers, EXHIBIT 2).

Soon after receiving these charges and noticing that there was no date for the Executive Session listed on the papers, Plaintiff submitted to Arbitrator Donald T. Kinsella, Esq., as part of her argument that the hearing could not proceed, as without a vote by the Panel For Educational Policy (PEP) in an Executive Session on Probable Cause, there was no subject matter jurisdiction for Arbitrator Kinsella to proceed with the hearing. (PEP Bylaws, EXHIBIT 3)

The Plaintiff's Motion To Dismiss For Lack of Subject Matter Jurisdiction, submitted before the pre-hearing to Arbitrator Kinsella, included the BYLAWS of the PEP.

Plaintiff, in her AFFIDAVIT, did not waive her rights to have Education Law 3020-a(2)(a) complied with:

"**BERTA MORALES**, being of full age and duly sworn, deposes and says:

1. My name is Berta Morales and I live at 143 East Main Street, Bergenfield, N.J. 07621.

2. I am a tenured teacher in good standing who has worked in the New York City public school system for more than twelve years.

3. On or about September 12, 2013 I received charges of alleged "unprofessional conduct" while a teacher at 09X070 - P.S. 70 during the 2010-2011, 2011-2012 and 2012-2013 school year(s).

4. The title of the documents attached to the charges is: "Notice of Determination of Probable Cause On Education Law §3020-a Charges" and proceeds to give the following information:

"Please be advised that at a meeting in executive session on the above date the school district identified herein has found that there is probable cause for Education Law §3020-a charge(s) against you. The specific charges are attached to this form. Within ten (10) days of receipt of these charges, you must elect to request a hearing before an impartial hearing officer, or waive your right to such a hearing."

5. I hereby give notice that I have filed for a hearing, however by agreeing to a hearing pursuant to §3020-a before a Hearing Officer I do not waive my legal rights to:

(1) submit to a Hearing which complies with due process for tenured teachers as stated in New York State Education Law §3020 and §3020-a;

(2) object to the process and substance of the manner in which probable cause was allegedly found, as stated in the paragraph titled "NOTICE TO TENURED EMPLOYEE" below which, upon information and belief, has misleading information about a "school district" "identifying" that there is "probable cause for Education Law §3020-a charge(s) against [me]".

6. Any Executive Session of a school board must be publicly noticed and must take place within a public meeting (Open meetings law Section 105) also noticed to the general public. Section 3020-a(2)(a) specifically refers to an "employing board" meaning a Board of Education, which does not currently exist in any school district within New York City; and this section of law also requires that a vote of the Board of Education is held, and a "majority" must vote in favor of probable cause:

*"Disposition of charges. Upon receipt of the charges, the clerk or secretary of the school district or employing board shall immediately notify said board thereof. Within five days after receipt of charges, the employing board, in executive session, shall determine, by a vote of a majority of all the members of such board, whether probable cause exists to bring a disciplinary proceeding against an employee pursuant to this section. If such determination is affirmative, a written statement specifying the charges in detail, the maximum penalty which will be imposed by the board if the employee does not request a hearing or that will be sought by the board if the employee is found guilty of the charges after a hearing and outlining the employee's rights under this section, shall be immediately forwarded to the accused employee by certified or registered mail, return receipt requested or by personal delivery to the employee."*

7. As there is no Board of Education in New York City at this time, and no "vote" with the mandated specificity as to where, when, by whom and on what information did the mandated vote take place, as well as no mention of the authority of a "school district" to identify probable cause, this paragraph in the Education Law Charge Transmittal Form must be declared null and void pursuant to Education Law Section 3020-a(2)(a).

8. The Department has not complied with the requisite jurisdictional predicates for filing disciplinary charges against Respondent and, as such, the Arbitration proposed is without subject matter jurisdiction to proceed.

9. The procedures memorialized in the documents attached have no basis in
   law or in fact, and the Hearing Officer thus has no jurisdiction to hear the charges attached

herein."

On March 6, 2014, Arbitrator Kinsella denied Plaintiff's Motion To Dismiss, yet in the transcript

of that hearing day, he would not permit Plaintiff's Attorney Debra Wabnik to speak about how

even if the Chancellor COULD delegate the finding of probable cause, which Attorney Wabnik

argued was not allowed by law under Education Law 3020-a(2)(a), there still should have been

an Executive Session held by the Chancellor or the designee, to determine probable cause:

MS. WABNIK: Well, it's not even a question
15 of having any authority to rule. You shouldn't be going
16 forward in this particular case. We shouldn't even be
17 here. I mean, this whole explanation that we had about
18 how everybody delegates to everybody else, it doesn't
19 explain why, in the notice of determination, it says that
20 a meeting was held in executive session on the above date
21 and the school district identified found that there was
22 probable cause. Nobody said this form had to be used.
23 The date of executive session is blank. If you want to
24 say the principal decided, on his or her own, that these
25 charges were going to be preferred against you pursuant to
such and such a statute, then put it in here. Put it in
3 the notice because this notice is completely ineffective.
4 It's not true. This didn't happen. So, to have us here,
5 based on notice of something that didn't even happen, is
6 inherently improper
THE HEARING OFFICER: [Interposing] The
3 Chancellor's delegated the duties. It's a 3020-a
4 proceeding. There is no -- . Everybody knows that. And
5 he's delegated the duties and the charges have been filed.

4

6 MS. WABNIK: The Chancellor didn't have the
7 authority to delegate the right to vote.
8 THE HEARING OFFICER: The Chancellor--
9 MS. WABNIK: [Interposing] He can't give
10 what he doesn't have.
11 THE HEARING OFFICER: The Chancellor has the
12 authority to act as the Board.
13 MS. WABNIK: Well then, the Chancellor--
14 THE HEARING OFFICER: It says.
15 MS. WABNIK: --should have had an executive
16 session, which had to be part of an open meeting.
17 THE HEARING OFFICER: Well, I assume that,
18 first of all, it wasn't the Chancellor, since obviously he
19 delegated it--
20 MS. WABNIK: [Interposing] Okay. Then the
21 principal--
22 THE HEARING OFFICER: --but whoever the
23 person is--
24 MS. WABNIK: --whoever the principal was--
25 THE HEARING OFFICER: --may well—
MS. WABNIK: --but this--
3 THE HEARING OFFICER: --have had an
4 executive meeting in their mind when they decided to bring
5 the charges.
6 MS. WABNIK: Well, that doesn't comply with-
7 -
8 THE HEARING OFFICER: But it's--
9 MS. WABNIK: --3020.
10 THE HEARING OFFICER: --it's clear that
11 Section 2590-h of the Education Law contemplates that
12 charges of this nature in the City of New York are going
13 to be brought by a determination of the Chancellor or his
14 or her delegate. And that's what occurred. So, your
15 motion is denied. And we can, on that basis, the case law
16 is interesting, but the statute is pretty specific. So,
17 let's proceed with the preliminary conference."

(transcript, 3-6-14, pp. 15-18, EXHIBIT 4)

Why did Arbitrator Kinsella not want to hear the argument for granting the Motion by Attorney

Wabnik? Because the NYC Department of Education (NYC DOE) does not want any arbitrator

on either 3020-a Panel – there are two, the Administrative Trials Unit or "ATU" and the Teacher

Performance Unit or "TPU" – to grant the Motion To Dismiss. Arbitrators in NYC are chosen to

work on the panels for a year, and receive $1400/day, plus expenses. This is a very lucrative position. The arbitrators are given cases by the Department, so they all try very hard to please the Directors of the ATU and the TPU by making decisions that they – the NYC DOE - are happy with. Arbitrators cannot go against the NYC DOE even if the law, NYC DOE rules and regulations, and/or United Federation of Teachers' Contract ("CBA") are ignored.

This has been shown in the 3020-a case charged against teacher Alan Herz in December 2016. The investigators did not conduct the investigation properly, and Arbitrator Phillip Maier dismissed the charges at the pre-hearing. This was shocking to the Department, so they sued both Alan Herz and Arbitrator Maier in Supreme Court. ( Index No. 100225-2017, EXHIBIT 5). The handwriting on the Petition belongs to Alan Herz, from whom these papers were obtained). Arbitrator Maier decided the right thing to do was to disregard the "silent" rule of the NYC DOE never to dismiss a hearing on procedural issues, and the City Law Department stepped in to overturn Arbitrator Maier's ruling, and pursue the charges against Mr. Herz. An Arbitrator in 3020-a hearings has never before been sued by the City for making a decision in a pre-hearing.

Additionally, the former Chancellor, Carmen Farina, spoke at a meeting on February 24, 2015 for all the Arbitrators and public Attorneys both for the NYC DOE and NYSUT who work on 3020-a arbitration hearings, and summarized how the 3020-a hearings should go. She advised all attendees that speed, not the Respondents' rights, were to be placed first. She told the participants that everyone should be mindful of limiting witnesses and getting the hearing done. See the video and read the transcript of Carmen Farina's speech here:

**The 3020-a Arbitration Newswire: At 3020-a The DOE and UFT Demand Speed, Not Due Process Rights**
https://advocatz.com/2018/06/10/3020-arbitration-newswire-3020-doe-uft-demand-speed-not-due-process-rights/

In fact, Mayor Michael Bloomberg had this in mind when he set up mayoral control in NYC and changed the NYC Board of Education with elected members to the Panel For Educational Policy, with appointed members. And he appointed the majority of the members so that in the end, he had control. His motive was to end tenure and stop the tenure rights for educators charged with anything. Everyone was automatically guilty, and must be terminated. Bloomberg had no time for a vote and for a procedure that left an open door to a group which may do something he did not want. As a result, the PEP has routinely violated many laws. One example is the Executive Session. If they needed to terminate a charged educator because this person did not request a hearing, then they scheduled an Executive Session to begin *before* the public meeting begins. (See Agenda, 2013 PEP, EXHIBIT 6).

A vote AFTER the public meeting starts is the requirement, as stated in Section 105 of New York State Open Meetings Law (available on the webpage of the NYS Committee on Open Government:

**§105. Conduct of executive sessions.**
1. Upon a majority vote of its total membership, taken in an open meeting pursuant to a motion identifying the general area or areas of the subject or subjects to be considered, a public body may conduct an executive session for the below enumerated purposes only, provided, however, that no action by formal vote shall be taken to appropriate public moneys:
a. matters which will imperil the public safety if disclosed;
b. any matter which may disclose the identity of a law enforcement agent or informer;
c. information relating to current or future investigation or prosecution of a criminal offense which would imperil effective law enforcement if disclosed;
d. discussions regarding proposed, pending or current litigation;
e. collective negotiations pursuant to article fourteen of the civil service law;
f. the medical, financial, credit or employment history of a particular person or corporation, or matters leading to the appointment, employment, promotion, demotion, discipline, suspension, dismissal or removal of a particular person or corporation;
g. the preparation, grading or administration of examinations; and
h. the proposed acquisition, sale or lease of real property or the proposed acquisition of securities, or sale or exchange of securities held by such public body, but only when publicity would substantially affect the value thereof.

7

2. Attendance at an executive session shall be permitted to any member of the public body and any other persons authorized by the public body.

(https://www.dos.ny.gov/coog/openmeetlaw.html)

Despite members of the public asking why the PEP members were violating the law, the PEP never has had an Executive Session after a public meeting starts.

PEP members also vote to close schools without meeting with the community and gathering data. See here:

**We won in court today to keep PS 25 open -- probably for at least another year!**
https://nycpublicschoolparents.blogspot.com/2018/05/normal-0-false-false-false-en-us-x-none.html

The PEP voting on closing schools in the manner that they do at every PEP meeting is against public policy but the PEP members do not comply with the rules or practice which a public school board is supposed to do. And if a member does disobey and votes against the Mayor, he/she is fired. This is no democracy, at least in areas which involve education.

So there is a pattern and practice of violating the laws, rules and regulations set up to guide and authorize due process public policy in New York City. PEP members are supposed to vote exactly as the Mayor and/or Chancellor wants, with or without any law to support the vote. Outside of NYC there is always a vote on probable cause exactly as described in Education Law 3020-a(2)(a).

For the argument on the due process for Plaintiff, there is one more issue which has not yet been decided: the Delegation memos. Reviewing the transcript on 3-6-14 in Ex. 6, the Court can see that Attorney Wabnik was not permitted to make any argument on the validity of the delegation memos. Arbitrator Kinsella stopped her from speaking and denied the Motion to Dismiss For Lack of Subject Matter Jurisdiction. Then, Arbitrator Mary O'Connell took his denial and agreed

with it and so did Judge Chan in the Supreme Court. No one has answered the many serious questions of validity for those delegation memos.

First, the charging papers do not mention Education Law 2590. In arbitration cases where the Respondent's Representative does not bring up the fact that there is no date for the Executive Session, no one bothers to bring up the fact that the Executive Session just is never held in NYC for anyone charged with 3020-a. So in terms of Notice, no charged educator is given any Notice that indeed, he/she has been charged pursuant to 3020-a AND 2590, and the Chancellor can give anyone, by delegation, the right to pursue charges and determine probable cause against any employee. The charged educator proceeds to a hearing accepting the lack of subject matter jurisdiction because neither NYSUT or the DOE Attorneys want to argue that there are procedural errors in the process.Outside of NYC, 3020-a charges are handled exactly the same way that Ed Law 3020-a states, with the school board voting on probable cause for the charges. Without the proper procedures under Ed Law 3020-a, no arbitrator should proceed to hearing. The fact that Education Law 3020-a(2)(a) mandates a certain procedure, and the 3020-a arbitration is held pursuant to tenure law 3020-a, then the violation of a vote means that proper procedures were not followed, and the arbitrator does not have subject matter jurisdiction.

Second, the delegation memos do not solve this problem. In the delegation memos the Chancellor may delegate the preferring of charges. There is no mention of determining probable cause. "Preferring" charges is not the same as "determining probable cause in an Executive Session". Indeed, an Executive Session must be held while a public meeting is going on, and each Session must have two or more members. So, if the Chancellor can delegate the determination of probable cause, there still must be an Executive Session of two or more people

in order to comply with the law. The Chancellor can call a meeting with a subordinate or more than one an "Executive Session". Problem solved.

Not so fast. The PEP Bylaws state clearly that the Chancellor cannot vote. Therefore, the Chancellor cannot hold an Executive Session and vote on charges to serve on an employee, because this would be outside of the Chancellor's authority. But we cannot ignore this quandary. The Chancellor cannot delegate the vote on probable cause to anyone, because this power and authority was never given to him/her. What is also clear is the intent of the State legislature when they wrote the Bylaws of the PEP: have a balance of power, do not allow the mayor and Chancellor to make all the decisions. This is good public policy, but was not good for the Mayor who wanted the 3020-a arbitration to be quick. Allowing a vote in an Executive Session takes time which NYC does not have, according to Mayor Bloomberg. The conclusion is:

nowhere in Education Law §3020-a is there a provision authorizing a Principal (or any single individual) to make a determination of probable cause.    The Chancellor also has no authority to determine probable cause, only to *initiate the charging process* without making any conclusions. Moreover, because the Chancellor has no vote as a member of the Panel for Educational Policy, he/she lacks the authority to grant any individual the authority to make a probable cause determination.  Even if the Chancellor was given the duties of the school board, this would still mandate a vote in an Executive Session before any charges were served on Respondent.

Third, as a tenured teacher, Respondent possesses a constitutionally protected property interest in her position of employment which may not be diminished in any manner without being accorded substantive fair hearing and due process rights. Matter of Soucy v. Board of Education of North Colonie Central School Dist No. 5, 41 A.D.2d 984, 343 N.Y.S.2d 624 (3rd Dep't 1973)). See also

10

New York's Court of Appeals in Ricca v. Board of Ed. of the City Sch. Dist, 47 N.Y.2d 385, 418 N.Y.S.2d 345 (1979):

"The tenure system is not an arbitrary mechanism designed to allow a school board to readily evade its mandate by the creation of technical obstacles . ... Rather it is a legislative expression of a firm public policy determination that the interests of the public in the education of our youth can best be served by a system designed to foster academic freedom in our schools and to protect competent teachers from the abuses they might be subjected to if they could be dismissed at the whim of their supervisors. In order to effectuate these convergent purposes, it is necessary to construe the tenure system broadly in favor of the teacher, and to strictly police procedures which might result in the corruption of that system by manipulation of the requirements for tenure."

Here, the Defendant failed to mention that N.Y. Municipal Home Rule Section 11(1)(c) states as follows:

""**No local legislative body is empowered to enact laws or regulations which supersede state statutes, particularly with regard to the maintenance, support, or administration of the educational system.**"

Thus the NYC DOE *cannot replace Education Law 3020-a, State Law, with local law Education Law 2590 which refers only to New York City's education system.*

In the Matter of Stephen Rosenblum, Respondent, v New York City Conflicts of Interest Board et al., Appellants, 75 A.D.3d 426; 903 N.Y.S.2d 228; 2010 N.Y. App. Div. LEXIS 5749; 2010 NY Slip Op 5875, the First Department Appellate Division held that the New York State Supreme Court ruling was correct, that "the exclusive avenue to discipline a tenured pedagogue is Education Law § 3020-a" (*see* Education Law § 3020; 53 RCNY 2-02 [a]).

*The Delegation memos allow the Chancellor to delegate to Superintendents the right to create charges against employees, but not the right to determine probable cause.*

The requirements of NYS Education Law §3020-a, under which tenured personnel may be disciplined for "just cause" are absolute and require that before charges can be brought against a

tenured educator, the school board[1] [PEP] must:

- Determine that there is "probable cause" for the proceeding with charges by a majority vote by the Board.

- Make this determination within 5 days of the charges being filed with the Board.

- Ensure that the decision to proceed with the charges is not frivolous, arbitrary, capricious or discriminatory.

This vote by the school board is required under Education Law 3020-a for a proper determination of "probable cause" upon which to bring charges against teachers removed from their schools. (Education Law §3020-a, Article 61). A determination of probable cause by an Independent Executive Session must, according to law, occur after charges are made against a tenured employee in order to mitigate against malicious prosecution, retaliation, and/or sheer vindictiveness (which is precisely what is transpiring here).  The legislative intent is to provide pedagogues protection from vindictive principals who may want to remove senior teachers from their positions because they make salaries that could pay for two teachers instead of one, or other unlawful reasons.

Education Law §3020-a *requires a vote by the school board [PEP] as the basis for deciding to charge a tenured employee by finding probable cause* (Education Law §3020-a(2)(a)).

Fourth, in the case at bar, the Principal was allowed to charge the Plaintiff, sign the probable cause determination, testify at the arbitration hearing, and run the entire show, from start to finish. This is not good public policy. What if, as Plaintiff has argued here, the principal maliciously made up the content of the observations in the charges, to remove the Plaintiff from

---

[1] In the City of New York, the Panel for Educational Policy ("PEP") serves as the "school board".

the school so that she did not get more information about the students not being provided their services?

The proof of incompetency is not in the observations, which are solely someone's subjective opinion, but in the outcomes of students. In this case the New York City department of Education did not present any students or student outcomes, therefore Arbitrator O'Connell decided to terminate Plaintiff without the data necessary to prove the specifications. She also did not consider Just Cause or Progressive Discipline. Why? Because she never had subject matter jurisdiction, and knew it, as well as that she would have not penalty on her arbitrator position on the panel. This makes Arbitrator O'Connell's decision to terminate Plaintiff invalid, arbitrary and capricious.

Therein lies the problem presented here, and highlighted by the prior decisions as well as the new decision submitted to this Court in the case of Rosalie Cardinale v the New York City Department of Education. The question of subject matter jurisdiction and the validity of the delegation memos were never answered in this case. There is no res judicata. There is still no answer.

## THERE ARE TRIABLE ISSUES OF MATERIAL FACT THAT PLAINTIFF SUFFERED ADVERSE EMPLOYMENT ACTIONS

On March 29, 2018, Judge Desmond Green in the Richmond County Supreme Court ruled that the procedural error of not having an Executive Session and vote on probable cause in her case had to nullify the right of Arbitrator Lendino to make a decision in the 3020-a as he had no subject matter jurisdiction. This ruling established new caselaw on the issue of the right of Respondents in New York City to have probable cause determined by a vote in an Executive Session by the Panel For Educational Policy (Cardinale v The New York

City Department of Education, Index No. 85165/2017). EXHIBIT 7

Judge Green upheld the argument that a lack of a proper determination of probable cause violated Respondent Rosalie Cardinale's due process rights as well as destroyed the integrity of the tenure protections guaranteed by the Constitution.

Plaintiff was subject to adverse employment actions by having her position as a bilingual special education teacher undermined by a principal who was worried that Plaintiff would expose the lack of supplies and services for the schools neediest kids, and use the procedures used in NYC to terminate any educator even if that educator was tenured, as in this case.

At no point did the Department prove with any fact or data that Plaintiff had suddenly become a permanently incompetent teacher. Instead of facts, data, and statistics, the 3020-a arbitrator and the Judge in the Article 75 decision both decided that the *opinion* of the Principal was enough "proof" of Plaintiff's incompetency to get her charged and removed from the school. There are no facts or statistics in observations, only non-final opinions:

"lesson observation reports ….are not statistical or factual tabulations or data, instructions to staff that affect the public, or final agency policy or determinations…… The reports are prepared to assist the Chancellor, and are not binding….. The   lesson observation reports consist solely of advice, criticisms, evaluations, and recommendations prepared by the school assistant principal regarding lesson preparation and classroom performance."

See Elentuck v Green, Supreme Court  of  New York, Appellate Division, Second Department, 202 A.D.2d 425; 608 N.Y.S.2d 701; 1994 N.Y. App. Div. LEXIS 1956, (1994).

Plaintiff's performance reviews were driven by bad faith and malice. Proof of this claim is in the observations, where absolutely nothing Plaintiff did was worthy of commendation. This makes no sense.

As demonstrated within, Plaintiff has met the standard of a *prima facie* claim of retaliation by an arbitrator who had no subject matter jurisdiction to make any decision at her 3020-a hearing..

For these reasons, Defendants' motion to dismiss should be denied in its entirety.

## ARGUMENT

In order to survive a motion to dismiss under Federal Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). As such, the plaintiff must allege facts that "raise a right of relief above the speculative level on the assumption that all allegations in the complaint are true (even if doubtful in fact)." Id. This does not, however, require heightened pleading standards. Rather, the Second Circuit has interpreted that language to require a flexible plausibility standard, "which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible , rather than to mandate a 'universal standard of heightened fact pleading ." McNamara v. Kaye, 2008 WL 3836024, at *4 (E.D.N.Y. Aug. 13, 2008) (quoting Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)). It is axiomatic that in deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must assume the veracity of well-pleaded factual allegations , and draw all reasonable inferences in the Plaintiff's favor. Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008).

Further , it is well settled that in the employment context, "a plaintiff need not allege specific facts establishing a prima facie case of discrimination to survive a motion to dismiss." Thai v. Cayre Group, Ltd., 726 F.Supp.2d 323 (S.D.N.Y . 2010); see also Bell Atlantic v. Twombley , 550 U.S. 544, 569-570 (2007) ("Heightened standard for Title VII cases was contrary to the Federal Rules structure of liberal pleading requirements .") Rather, the complaint need only "be facially plausible," and "give fair notice to the defendants of the basis for the

claim." <u>Barbosa v. Continuum Health Partners, Inc.</u>, 716 F.Supp.2d 210, 215 (S.D.N.Y. 2010) (quoting <u>Twombly,</u> 550 U.S. at 569-70). See also <u>McIntyre v . Longwood Central School Dist.</u>, 2008 WL 850263, at *8 (E.D.N.Y. 2008). ("Therefore , the controlling standard for survival of a motion to dismiss lies not in <u>McDonnell Douglas</u> , but in Rule 8(a) of the Federal Rules of  Civil Procedure, which requires a "short and plain statement of the claim showing that the pleader is entitled to relief .") (citing <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 510 (2002)).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' motion to dismiss in its entirety, together with such other relief this Court deems just and proper.

Dated: June 11, 2018

Berta Morales

16



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street*
*New York, New York 10007*

December 21, 2015

<u>By E-Mail and First Class Mail:</u>
Courtenaye Jackson-Chase
General Counsel
New York City Department of Education
52 Chambers Street
New York, N.Y. 10007

Dear Ms. Jackson-Chase:

The passage of the historic Americans with Disabilities Act of 1990 (the "ADA") reflected a clear and comprehensive mandate to eliminate what had become pervasive discrimination against individuals with disabilities. Physical barriers and public policies had long prevented individuals with disabilities from accessing on an equal basis critically important government services and programs. And nowhere is it more important to tear down the barriers to equal access than with respect to the education of our children. But today, in New York City, 25 years after passage of the ADA, children with physical disabilities still do not have equal access to this most fundamental of rights. Based on the City's own statistics and characterizations of its schools, 83% of public elementary schools are not "fully accessible" to people with disabilities and six of the City's school districts, serving over 50,000 elementary school students, do not have a single school that is "fully accessible" to people with disabilities. Moreover, children with disabilities are frequently denied the experience that many of their peers take for granted: attending their local public school with their friends and neighbors. Instead, starting in kindergarten, these children are often forced unnecessarily to travel outside of their neighborhoods to schools where there are no familiar faces. The result is that children with disabilities and their families are being deprived of the countless meaningful and tangible benefits of being part of their own local school communities, including full and easy participation in after-school and extracurricular activities; attendance without hardship at parent-teacher conferences; reasonable commutes that don't unduly interfere with study, homework, and family time; and natural bonds of friendship and community developed with neighborhood children through playdates and school activities. The costs of this situation are acutely illustrated when a parent so wants a child to go to school in the local zoned school that the parent is willing to go to the child's school several times a day to literally carry the child up and down stairs so that the child can attend classes there. Given this unacceptable state of affairs, we ask the City to provide a response to the findings detailed below that includes the corrective actions the City intends to undertake to begin to remedy its lack of compliance with the ADA.

December 21, 2015
– page 2 –

For the past two years, the United States Attorney's Office for the Southern District of New York has been investigating whether the City of New York has complied with its obligations under Title II of the ADA and the Department of Justice's implementing regulations as they relate to the physical accessibility of public elementary schools, including schools housed in facilities constructed or altered after January 26, 1992.[1]  Our investigation found that New York City's elementary schools still are not "readily accessible to and usable by" individuals with disabilities, 28 C.F.R. §§ 35.150 & 35.151, a population which includes not only students, but teachers and family members as well.

Nor has the City complied with the requirements of the ADA even as to alterations that have been undertaken since January 1992, the year that the ADA went into effect.  For example, in one elementary school that we examined, the City installed an elevator in 2000, but neglected to make that elevator accessible to people with disabilities in accordance with the requirements specified under applicable federal regulations.  As elevator access is almost always a significant logistical impediment to making a building accessible to those with mobility impairments, the City's failure to consider the needs of individuals with disabilities when upgrading and renovating its existing facilities is inexcusable.  The City also has failed to make basic, relatively low-cost fixes to its facilities that would help make the schools more accessible.

**A.  Our Investigation**

As part of our investigation, we reviewed the City's policies regarding the accessibility of New York City schools, including all information available on the New York City Department of Education ("DOE") website and the DOE's Capital Plans, including plans for increasing accessibility.  We have also reviewed the City's data regarding the accessibility of schools throughout the five boroughs, the number of children with physical disabilities attending New York City schools, and the distances traveled on buses by such children to attend New York City schools.[2]  Further, we interviewed families of children with mobility impairments who either attended New York City elementary schools or who had attempted to enroll in a public school and were discouraged from doing so.  Finally, we had an architect who specializes in ADA accessibility visit eleven schools and conduct a thorough examination of each school to identify barriers to accessibility.  The sample set of schools included schools in every borough.  The schools we selected for examination by the architect were located in school districts with particularly low percentages of accessible schools, according to data provided to us by the City.  Of the elementary schools we selected, ten were designated by the City as not accessible and one

---

[1] For purposes of this letter, the term "school" does not include any middle school, high school, pre-kindergarten, vocational, continuing, or adult education programs.

[2] We note that the data regarding the bus distances provided by the City was insufficient to calculate the amount of time the students actually spend traveling to schools, since the amount of time it can take to travel a couple of miles on a school bus can vary widely depending on the bus route and traffic.  Although we have asked the City for more information regarding actual travel times, the City has not provided the information to us.

December 21, 2015
– page 3 –

was designated as "functionally accessible." The inspected schools, and the pertinent findings of our architect at each of those schools, are identified in Exhibit A to this letter.[3]

### B.  Legal Standard

In enacting the ADA, Congress found that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural . . . and communication barriers, . . . failure to make modifications to existing facilities and practices . . . segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. § 12101(5). Therefore, Congress proscribed not only "obviously exclusionary conduct," but also "more subtle forms of discrimination—such as difficult-to-navigate restrooms and hard-to-open doors—that interfere with disabled individuals' full and equal enjoyment" of public places and accommodations. *Chapman v. Pier 1 Imps. (U.S.) Inc.*, 631 F.3d 939, 945 (9th Cir. 2011).

Title II of the ADA provides, among other things, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.149.  The term "public entity" includes local governments.  *See* 42 U.S.C. § 12131(1)(A).

Pursuant to Title II and its implementing regulations, a public entity has the obligation to provide access to its services and programs in a manner that does not discriminate against individuals with disabilities.  Specifically, pursuant to Subpart B of the regulations, a public entity may not, among other things, provide a person with a disability with an aid, benefit, or service that is not equal to or as effective as that provided to others.  *See* 28 C.F.R. § 35.130(b)(1)(i)-(iii).  A public entity is also prohibited from providing "different or separate aids, benefits or services to individuals with disabilities than is provided to others unless such action is necessary to provide [such individuals] aids, benefits, or services that are as effective as those provided to others."  28 C.F.R. § 35.130(b)(1)(iv).

With respect to physical access to facilities, Subpart D of the regulations states that "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. § 35.149.  The regulations thus require a public entity to "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150.  The regulations also specify that in determining how it will provide physical access to its programs, a public entity is required to prioritize methods of compliance that enable it to provide services to persons with disabilities in "the most integrated setting appropriate." 28

---

[3] Although our examination found numerous examples of architectural barriers on each floor of the schools that we examined, Exhibit A does not list those architectural barriers found on the upper floors of such schools, where those upper floors are themselves inaccessible to those with mobility impairments.

December 21, 2015
– page 4 –

C.F.R. § 35.150(b)(1).  Moreover, for alterations affecting the usability of a facility commenced after January 26, 1992, a public entity is required to ensure that such alterations are "to the maximum extent feasible . . . readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(a)(1).

Finally, the regulations also require a public entity to make reasonable modifications to policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, unless the public entity can prove that such modification would fundamentally alter the nature of the service.  28 C.F.R. § 35.130(b)(7).  Indeed, courts have explained that public entities must ensure that individuals with disabilities are afforded "meaningful access" to that entity's publicly offered services, benefits, and activities, *see, e.g.*, *Alexander v. Choate*, 469 U.S. 287, 301 (1985), and that the entity will frequently have to make modifications to its policies, practices and procedures in order to avoid discriminating against individuals with disabilities, and to truly afford them "meaningful access."  *Id.*; *see also Tennessee v. Lane*, 541 U.S. 509, 531 (2004) (noting that the "failure to accommodate persons with disabilities will often have the same effect as outright exclusion").

## C. Findings

The ADA authorizes the Department of Justice to investigate alleged violations of Title II, *see* 42 U.S.C. § 12133, and the implementing regulations authorize DOJ to conduct compliance reviews of public entities, 28 C.F.R. § 35.172(b).  Although our review of the accessibility of New York City's public elementary schools is ongoing, and we reserve the right to supplement our findings, we have reached the following findings of fact and conclusions of law, and propose certain remedial measures, based upon the information we have obtained to date.

### 1.  Failure to Make Schools Accessible

First, looking at the public elementary school system in its entirety, we have concluded that New York City elementary schools are not currently "readily accessible to and usable by individuals with disabilities."  28 C.F.R. §§ 35.149, 35.150 & 35.151.  Using the City's own figures and definition of "fully accessible" schools, only approximately 17% of public elementary schools are "fully accessible."  Districts 3, 5, 8, 12, 16 and 21 do not have any "fully accessible" elementary schools.  This abysmally low percentage of schools demonstrates that the City has failed to provide program accessibility to individuals with disabilities comparable to the program accessibility available to individuals without disabilities.[4]

In recognition of the dearth of "fully accessible" elementary schools, the City has designated a number of schools as "functionally accessible."  According to the City, a "functionally accessible" school is one which does not meet the requirements of the ADA, and

---

[4] These statistics, and the statistics provided throughout this letter regarding the accessibility of public elementary schools, do not include charter schools or District 75 schools.

December 21, 2015
– page 5 –

thus is not "fully accessible," but nonetheless offers individuals with mobility impairments some level of access to relevant programs and services, including the science laboratory, library, cafeteria, gymnasium, and at least one restroom.

Our investigation has not yet independently examined whether the schools that the City has designated as "fully accessible" comply with the ADA, or whether those schools designated as "functionally accessible" are in fact readily accessible to those with mobility impairments.[5] Indeed, the terms "functionally accessible" and "fully accessible" are not derived from the ADA. We note, however, as discussed later in this letter, that the one school we visited that was designated by the City as "functionally accessible" lacked certain crucial accessible features, raising a serious question as to the accuracy of the City's categorizations. Moreover, the City's definition of functional accessibility does not include accessibility for those with hearing or vision impairments as required by the ADA Design Standards.[6]

However, even crediting the City's categorizations and including those schools that have been designated as "fully accessible" and "functionally accessible," the percentage of accessible elementary schools in New York City is inadequate to provide program accessibility. For example, in the 2013-2014 school year, District 8 had only a single "functionally accessible" school serving a district with approximately 13,000 elementary students. After we alerted the City to our concerns regarding the dearth of accessible schools in District 8 in particular, the City reclassified a school that had previously been designated as "non-accessible" as "functionally accessible," and opened a new "functionally accessible" school within the district. Yet even with these changes, in the current school year (2015-2016) only approximately 20% of District 8 schools provide any level of accessibility.

Similarly, in the current school year, only approximately 21% of the elementary schools in District 16 and 31% of the elementary schools in District 4 are designated as "functionally accessible." Strikingly, 24 of the 32 City school districts have less than a 50% accessibility rate for public elementary schools, even when including schools that the City has designated as "functionally accessible."

---

[5] The City acknowledges that in some of the schools designated as "functionally accessible," "school programs may need to be re-located to accommodate access."

[6] The term "ADA Design Standards" encompasses both the 1991 ADA Standards for Accessible Design (the "1991 Standards") and the 2010 ADA Standards for Accessible Design (the "2010 Standards"). The 1991 Standards, found in Appendix D to 28 C.F.R. Part 36, govern all new construction and renovations under Title II of the ADA from the time period January 26, 1992, through March 15, 2012. Beginning on March 15, 2012, all new construction and renovations under Title II must be performed in accordance with the 2010 Standards. *See* 28 C.F.R. § 35.151(c). The 2010 Standards consist of the 2004 ADAAG and the requirements contained in 28 C.F.R. Part 36, subpart D. *See* 28 C.F.R. § 36.104; *see also* appendices B and D to 36 C.F.R. part 1191 (2009) ("2004 ADAAG"). The architect who conducted the examination of New York City schools identified barriers to access under both the 1991 Standards and the 2010 Standards. Elements that are identified in this letter as not complying with the requirements in the 1991 Standards should be modified to comply with the 2010 Standards. All of the standards and regulations are available at www.ada.gov.

December 21, 2015
– page 6 –

As a result of the lack of accessible schools, students with mobility impairments are often excluded from their local zoned school, the school that their peers in their community all attend. These students may need to spend significant amounts of time traveling to a school that can accommodate their physical disabilities. Requiring elementary students with disabilities to travel extensively at the beginning and end of each school day—a condition which is not imposed upon their peers—can impose particularly onerous physical demands on these children.

In the course of our investigation, we spoke to one family who went to extreme measures to keep their child enrolled in their zoned local school, rather than subject the child to a lengthy commute to the closest "accessible" school. A parent of this elementary school child was forced to travel to the school multiple times a day, every school day, in order to carry her child up and down stairs to her classroom, to the cafeteria, and to other areas of the school in which classes and programs were held.

The City has defended its failure to make a sufficient number of elementary school facilities accessible by pointing to the fact that the thousands of children with mobility impairments who attend public school constitute only a small percentage of the overall student population. We find this explanation unacceptable and inadequate. First, the City's legal obligation to provide program accessibility does not depend upon the number of students with disabilities located in a particular geographic area. *See* DOJ Title II Technical Assistance Manual at II.5.1000. It will always be the case that children with disabilities will be a relatively small percentage of the entire student population. Obviously that cannot be a basis not to comply with the ADA. If even one child has been denied equal access to the City's educational programs on account of a disability, that is one child too many. Second, the City's data does not account for non-students with disabilities who use public school facilities, such as teachers, staff members, parents, grandparents, or other family members of school children who wish to participate in parent-teacher conferences, attend a school performance, or join the PTA. Third, our investigation has revealed that, due to the dearth of accessible elementary school options, some parents are effectively forced to send their children to private schools.[7]

We are aware that the City's most recent five-year Capital Plan includes funds to increase the accessibility of eleven schools, listed under the "Accessibility Program" of the Capital Plan. Those efforts are woefully insufficient. The 2015-2019 Capital Plan includes hundreds of planned physical renovations to schools in addition to the eleven accessibility projects. It is not clear from the Capital Plan, however, whether any of these additional planned physical

---

[7] Further, although we have not to date investigated issues pertaining to District 75, we note that the percentage of students with mobility impairments increases significantly when District 75 schools are included in the analysis. The City has stated that District 75 is designed to serve children with autism, cognitive delays, severe emotional challenges, or sensory impairments. Yet our investigation suggests that some families may have been encouraged to send children with only mobility impairments to a District 75 school, even though these children do not have a condition that would appear to necessitate a District 75 placement. Indeed, according to figures provided to us by the City, almost half of the public school children with mobility impairments ultimately attend District 75 schools, underscoring the severely limited opportunities available to children with mobility impairments and the City's clear failure to meet their needs. We reserve the right to conduct an ADA investigation relating to District 75 at a later date.

December 21, 2015
– page 7 –

renovations—which include "upgrades" to cafeterias, auditoriums, and toilets—will be undertaken in such a way as to increase the accessibility of those areas of the schools as well as the path of travel to those altered areas. Those projects are detailed separately from the eleven projects listed under the "Accessibility Program" of the Capital Plan. Moreover, as described below, the City has consistently failed to comply with the ADA when making alterations or "upgrades" to school facilities. At a minimum, the City must ensure that all planned upgrades and renovations are completed in a manner that complies with the ADA and increases accessibility to school facilities.

### 2. Failure to Comply with the ADA When Making Alterations to Existing Facilities

In every school visited by our architect, we identified alterations made after January 1992 that were not compliant with the ADA. Such alterations included, but were not limited to, fire alarm systems, door hardware, toilet partitions, cafeteria seating, main office counters, library furniture, and playground areas. *See* Exhibit A. The City's failure to make these altered components accessible constitutes an explicit violation of the implementing regulations of the ADA. "Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992." 28 C.F.R. § 35.151(b)(1). The definition of facility includes both "all or any portion of the buildings, structures . . . [and] equipment." 28 C.F.R. § 35.104. The fact that these alterations were made in schools that are not otherwise accessible is no defense for not ensuring that the altered portion of the facility is readily accessible to and usable by individuals with disabilities. "The distinction between the treatment of existing facilities and alterations reflects Congress' recognition that mandating changes to existing facilities could impose extraordinary costs. 'New construction and alterations, however, present an immediate opportunity to provide full accessibility.'" *Civic Ass'n of the Deaf of New York City, Inc. v. Giuliani*, 970 F. Supp. 352, 359 (S.D.N.Y. 1997) (quoting *Kinney v. Yerusalim*, 9 F.3d 1067, 1074 (3d Cir. 1993)). "Thus, while Congress chose not to mandate full accessibility to existing facilities, it required that subsequent changes to a facility be undertaken in a non-discriminatory manner." *Id.* "The more stringent requirements for alterations reflect a belief that it is 'discriminatory to the disabled to enhance or improve an existing facility without making it fully accessible to those previously excluded.'" *Id. Cf. Disabled in Action of Pennsylvania v. Southeastern Pennsylvania Transportation Authority*, 635 F.3d 87, 92 (3d Cir. 2011) ("In other words, if a public entity chooses to make changes rising to the level of "alterations" to a facility, it ordinarily must use that opportunity to make the altered part of the facility accessible, as well."). The City must end its practice of ignoring the ADA when making alterations to schools.

### a. Post-January 1992 Construction of an Addition to a School

The most glaring example of the City's failure to make alterations readily accessible to and usable by individuals with disabilities was the construction of an addition to a school in Queens in 2000. As a result of this addition, the school has been identified by the City as being "functionally accessible." But even though the addition was built ten years after the passage of

December 21, 2015
– page 8 –

the ADA, it is riddled with inaccessible features.  Most strikingly, it has an elevator that is not compliant with the ADA Design Standards, as the elevator is not the required width.  *See* Exhibit A; *see also* 2010 Standards §§ 206.6, 406.4.1; 1991 Standards §§ 4.1.3(1), 4.10.9.  Moreover, while the school's addition has visual alarms, the visual alarms are not in the classrooms as required.  *See* Exhibit A.  Other non-compliant features in the addition include bathroom grab bars that are not the appropriate dimensions, door knobs and faucets that require tight grasping and twisting to operate, drinking fountains with inaccessible features, an inaccessible sink in a classroom, and a cabinet obstructing a circulation path.  *See id.* Failing to construct the addition as readily accessible to and usable by individuals with disabilities constitutes a violation of the ADA.  *See* 28 C.F.R. § 35.151(b)(1).

Further, notwithstanding that the City has designated this particular school as "functionally accessible," the gymnasium is not accessible to those with mobility impairments, as the accessible route is blocked by a half flight of stairs.  Moreover, in addition to the issues relating to the building addition noted above, many other post-January 1992 alterations made at this purportedly "functionally accessible" school do not comply with the ADA, including the fire alarm system, the cafeteria seating, the playground area, and the main office counter.  *See* Exhibit A.  These findings, and other barriers to access that were found at this school, as detailed further at Exhibit A, call into question whether even those schools that are designated as "functionally accessible" by the City are in fact accessible to those with mobility impairments.

### b. Entrances

The City also has failed to add an accessible entrance to those schools that have undergone renovations since January 1992.  When making alterations to a facility, the ADA regulations require covered entities to make the path of travel to altered primary areas accessible to the extent the cost of doing so is not disproportionate to the cost of the overall alteration.  28 C.F.R. § 35.151(b)(4).  Path of travel accessibility is considered disproportionate when its cost exceeds 20% of the cost of the alteration to the primary function area.  When the cost of alterations necessary to make the path of travel to an altered area fully accessible is disproportionate to the cost of the overall alteration, public entities should prioritize certain elements to provide the greatest access to parts of the facility that have been altered to become accessible.  28 C.F.R. § 35.151(b)(4)(iv)(A).  The first priority to ensure a path of travel to altered accessible portions of the facility should be an accessible entrance.  *See id.*  Of the eleven schools we examined, however, only one had an ADA-compliant entrance.  Four other schools have an entrance that arguably could be used by some people using wheelchairs, yet these entrances nonetheless have numerous inaccessible features.[8]  *See* Exhibit A.  These non-ADA compliant features include ramps with slopes that are too steep for wheelchairs to navigate safely, insufficient clear space on the ramps to allow wheelchairs to make turns, changes in level that are not beveled, and ramps with either no handrails or handrails without compliant

---

[8] Furthermore, at schools where the main entrances are inaccessible, the City has uniformly failed to provide signage indicating the locations of an accessible entrance, as they are required to do under the governing regulations.  *See* 2010 Standards §§ 216, 703; Exhibit A.

December 21, 2015
– page 9 –

extensions and edge control, rendering them unsafe. *See* Exhibit A. To the extent any of these ramps were constructed after January 1992, the City has violated the ADA by not making them readily accessible and compliant with the ADA Design Standards. *See* 2010 Standards §§ 206.1, 303.3, 405; 1991 Standards §§ 4.1, 4.5, 4.8.[9] In addition, to the extent primary function areas in these schools were altered since January 1992, the City has violated the ADA by not spending an additional 20% of the cost of the alteration on improving the accessibility of these entrances.

The failure of the other altered schools to construct any accessible entrance is even more troubling, as each of these schools has entrances that easily could be made accessible to those in wheelchairs. For example, PS 41 has a street level main entrance that requires only a minor, one inch change in level to render it accessible. Making such alterations to school entrances is a critical step in providing access to the City's public elementary school programs to more individuals with disabilities.

### c.   *Alarm Systems*

Our examination of the sample set of schools also revealed that, in a number of schools, alarm systems had been upgraded or replaced without fully complying with the regulations regarding visible alarms. *See* 2010 Standards §§ 215.1, 702; 1991 Standards § 4.28.1. Specifically, as outlined in Exhibit A, a number of schools have installed visible alarm systems, but failed to install visible alarms in all locations used by students. Failure to properly install visible alarms in all areas of common usage leaves individuals with hearing impairments at risk in the event of a fire or other emergency. Each of the elementary schools that has upgraded or replaced its fire alarm system since January 1992 but has failed to install visible alarms in all common use areas, including in all restrooms, classrooms, and any other room used by students or members of the public, should remedy its violations of the ADA promptly.

### d.   *Door Hardware*

Schools uniformly did not have accessible door hardware. The ADA requires that door hardware must be operable with one hand and shall not require tight grasping, pinching, or twisting of the wrist. *See* 2010 Standard §§ 206.5, 309.4, 404.2.7; 1991 Standards § 4.13.9. It is improbable that none of the schools we visited has changed any of its door hardware in the past 24 years. To the extent that any of the hardware was replaced since January 26, 1992, and hardware was installed that does not meet the ADA Design Standards, the City has violated the ADA. Even if door hardware in elementary schools has not been replaced since the ADA was enacted, updating door hardware so that it can be operated by those with physical impairments is a low cost change the City should make to its public schools to generally increase program accessibility.

---

[9] To the extent any of these ramps were constructed prior to January 1992, the alterations required to bring these ramps into compliance with the 2010 Standards are relatively minor. Yet these changes still have not been made.

December 21, 2015
– page 10 –

### e.  Main Office Counters

A number of schools installed non-ADA compliant counters in their main offices after the ADA Standards for Accessible Design went into effect, as set forth in Exhibit A. Specifically, when installing such counters, the City was required to ensure that either a portion of the main counter or an auxiliary counter had a maximum height of 36 inches. *See* 2010 Standard §§ 227.3, 904.4; 1991 Standards § 7.2(2).  The City's failure to do so violated the ADA.

### f.  Playgrounds

A number of the schools that we surveyed also failed to comply with the ADA Standards for Accessible Design when renovating their playgrounds post-January 1992.  Schools installed seating areas in the playgrounds that were not accessible, and many playgrounds had changes in level that were not beveled or sloped in a manner compliant with the ADA Standards for Accessible Design, as detailed in Exhibit A.  Furthermore, many of the accessible entrances to these playgrounds do not comply with the ADA Standards for Accessible Design, including by having ramps that are too steep or without handrails. *See id.*

### 3.  Program Access and Failure to Make Reasonable Modifications

Our investigation also revealed that the City has failed to undertake ongoing physical and programmatic changes to ensure that its elementary school program, when viewed in its entirety, is accessible and usable by people with disabilities.  28 C.F.R. § 35.150.  In addition, the City has failed to consider requests by students with disabilities for reasonable modifications that would allow those students to attend their zoned school, 28 C.F.R. § 35.130(b)(7), including by failing to assess whether requested modifications would be reasonable in a particular case.  Subsequent to the start of our investigation, the City made information regarding accessible schools easier to find on its website, implemented a complaint procedure for families encountering issues with physical accessibility, and assigned an individual to consider individual requests to make alterations at a particular school that could allow a disabled student greater access to school facilities.  We appreciate the City's efforts to increase the information available to parents and to be more responsive to the needs of individuals with disabilities.  However, these efforts fall far short.

We have reviewed the information available on the DOE's website regarding physical accessibility and have not found any reference to a policy or guidelines addressing how decisions concerning particular requests for accommodations will be made.  Moreover, while there is a link to an email address for "general inquiries about accessibility," there is no indication that reasonable modifications are being offered to students with physical disabilities who wish to attend a school that is not listed as either accessible or "functionally accessible."  Parents visiting the DOE website would not be aware of the possibility of requesting such a modification, and may therefore reasonably assume that their child must only attend one of the "accessible" schools.  The City's failure to provide a mechanism for students with disabilities to request a reasonable accommodation violates the ADA. *See* 28 C.F.R. § 35.106.

December 21, 2015
– page 11 –

### D. Minimum Actions Necessary to Remedy Violations

#### 1. Ensure that All Post-January 1992 Alterations and New Construction Comply With the ADA Design Standards

First, as noted above, our investigation revealed that the City has routinely ignored the requirements of the ADA when making alterations to school facilities. The City must end this practice going forward. The City must also remedy its past violations of the ADA by ensuring that all post-January 1992 alterations made to its public school facilities, as well as all new construction since January 1992, comply with the relevant ADA Design Standards. The City must act expeditiously to remedy all violations identified above and in Exhibit A with respect to the schools surveyed in the course of our investigation. The City must also conduct a comprehensive survey, under the supervision of a consultant mutually acceptable to the City and the United States with expertise in the area of ADA accessibility, of its existing facilities to identify other failures to comply with the ADA when making alterations or constructing new facilities, and act to remedy those additional violations.

#### 2. Provide Program Accessibility to the First Floor, Auditoriums, Gymnasiums, and Cafeterias

In addition to remedying its violations with respect to new construction and post-January 1992 alterations, the City must take immediate steps to remedy the systemic accessibility failings in the City's public elementary schools. *See* C.F.R. § 35.150(b) (noting that public entities can comply with the ADA by altering existing facilities in such a way as to make its services, programs, or activities readily accessible to and usable by individuals with disabilities where other methods are ineffective in achieving compliance). As an initial matter, the City must develop a comprehensive plan to survey all elementary schools and recommend a system-wide remediation plan to address the lack of accessibility. The City should make it a priority to increase the accessibility of the first floors of school buildings and the rooms used by all students, teachers, parents, or other visitors to the schools, including making the following accessible: at least one entrance, all classrooms, the auditorium, the gymnasium, the cafeteria, and at least one toilet stall for each sex (for adults and children) or a single unisex toilet room (for adults and children). *See* 28 C.F.R. § 35.151(b)(4)(iv)(A) (describing which elements should be prioritized to provide the greatest access). In passing the ADA, Congress explained that the concept of readily accessible "is intended to enable people with disabilities (including mobility, sensory, and cognitive impairments) to get to, enter and use a facility. While the term does not necessarily require the accessibility of every part of every area of a facility, the term contemplates a high degree of convenient accessibility, entailing accessibility of parking areas, accessible routes to and from the facility, accessible entrances, usable bathrooms and water fountains, accessibility of common use areas, and access to the goods, services, programs, facilities, accommodations and work areas available at the facility." H.R. Rep. No. 101-485, pt. 2, at 117-118 (1990). Many of the required modifications are minor, but the benefits—increasing accessibility for many—are hugely significant in the lives of children, their families, and others who use the schools.

December 21, 2015
– page 12 –

### a.   Entrances

As discussed above, the first priority in ensuring that the first floor of a facility is readily accessible to and usable by individuals with disabilities is ensuring that at least one entrance to the school is accessible.  To the maximum extent feasible, every New York City school should have at least one accessible entrance.  We have concluded that it would be feasible to construct an accessible entrance at each of the elementary schools that we examined, to the extent one did not already exist.

### b.   Bathroom on the First Floor

Other than the Queens school that underwent a recent addition, not one of the schools we examined had an accessible toilet room for adults or children on the first floor of the school. This means that children in wheelchairs are denied accessible bathrooms at these schools.  It also means that any family member with a mobility disability attending a school performance or a parent-teacher conference is not able to use a restroom during his or her visit.  As noted, providing at least one accessible toilet room on the first floor of every school should be a priority of the City.

### c.   Auditoriums

The accessibility of auditoriums is not only important for students, but also for family members and members of the public who assemble in the auditorium throughout the school year for school performances or public events.  A parent in a wheelchair should be able to attend his or her child's school performances.  Yet every school auditorium we visited lacked basic accessible features.  Assembly areas with fixed seats and an audio amplifications system require the provision of an assistive listening system.  See 2010 Standards § 219; 1991 Standards § 4.1.6(1).  Despite this requirement, none of the schools we examined had assistive listening systems available in the auditoriums.  Even where there were indications that such a system had been installed, the receiver devices needed to use the systems were not located on school premises.  See Exhibit A.  The regulations further require a certain percentage of seats to be replaced with wheelchair accessible spaces.  2010 Standards § 221; 1991 Standards § 4.1.  Yet, although nine of the schools that we visited had auditoriums on an entry level floor, not one had a single wheelchair accessible space in the auditorium.  See Exhibit A.  Finally, although many of the schools we examined use the auditorium stage for student instruction, not a single school that we examined had an accessible route from the seating area to the stage that was compliant with the ADA Standards for Accessible Design.  See Exhibit A.  Again, such accessibility is necessary to provide access to the City's public elementary school program.

### d.   Gymnasiums

School gymnasiums are also commonly used for large group events involving family members and children and should therefore be readily accessible to and usable by individuals with disabilities.  For about half of the schools we examined, the gymnasiums were on the first floor and could be made accessible by making very minor modifications.  Such changes include ensuring that coat hooks and other operable parts are within reach and not obstructed, installing

December 21, 2015
– page 13 –

accessible drinking fountains with accessible controls and with the requisite knee space, addressing obstructions in circulation paths, and providing wheelchair seating in gymnasiums with fixed assembly seating. *See* Exhibit A.

### e. Cafeterias

Cafeterias are also commonly used for large group events involving families and children, and should therefore be readily accessible to and usable by individuals with disabilities. As with gymnasiums, in the overwhelming majority of schools we examined, the cafeterias were on the first floor and could be made accessible through minor alterations. One consistent problem we saw throughout the schools is that, even where new cafeteria tables had been purchased since January 1992, the City had not installed any accessible tables. Consistent with the governing regulations, when the City replaces fixed furniture at schools, the new furniture must be readily accessible to individuals with disabilities. *See* 28 C.F.R. § 35.151(b); 2010 Standards §§ 226.1, 902.2; 1991 Standards §§ 4.1.6(1), 4.1.3(18), 4.32. To the extent any of the furniture does not include fixed seating, such as moveable cafeteria tables, the City is still required to make reasonable modifications to ensure that students with mobility disabilities are able to eat in the cafeteria. 28. C.F.R. § 35.130(b)(7). Other barriers to accessibility in the cafeterias we visited were inaccessible drinking fountains, inaccessible bathrooms, objects protruding into circulation paths, coat hooks that are too high, and insufficient clear openings at entrances to the cafeteria and entrances to food lines. *See* Exhibit A. Most of these barriers to accessibility could be removed with minimal cost to the City.

### 3.  Remedy Protruding Objects and Absence of Signage

In every school that we examined, we found wall mounted objects that protruded into circulation paths, in violation of Section 307 of the 2010 Standards. *See also* 1991 Standards § 4.4. *See* Exhibit A. Such protruding objects are a hazard to those who are blind or have low vision, as they can be seriously injured if they cannot detect such objects with the sweep of their canes. The City could easily remedy these barriers to accessibility in its schools by ensuring either that such objects are mounted in accordance with the specifications set forth in the 2010 Standards, or that a fixed element is placed at a cane-detectable height, such as a barrier or other detectable warning system.

Similarly, schools uniformly lacked signage with raised characters that conforms to Sections 216 and 703 of the 2010 Standards, as detailed in Exhibit A. Posting such signage at entrances, exits, stairways, classrooms, and restrooms would not be unduly expensive, and would increase the accessibility of public schools for those with vision impairments. Signage directing persons with mobility impairments to an accessible entrance or restroom, where such entrances or restrooms exist, would also increase the accessibility of schools at a relatively minimal expense to the City.

December 21, 2015
– page 14 –

### 4. Develop a Reasonable Modification Policy to Address the Needs of Children with Physical Disabilities

Students with disabilities must be provided with a mechanism for requesting reasonable accommodations from DOE that would permit them to attend their school of choice, even if such school has not been designated as accessible by the City. DOE should make clear to parents and students that such accommodations may be not only for structural changes to the facility, but could also include non-structural accommodations, such as moving a classroom to the first floor of a school or providing a student with an aide, depending upon the facts of the particular case. DOE should clearly set forth the mechanism for making such requests on its website.

The City should also develop a policy or guidelines for addressing such requests. Where a request would require the removal of architectural barriers, the City should make an assessment as to whether the removal of such architectural barriers is necessary in that particular case in order to provide the benefits of the elementary school program (including benefits to parents, family members and the public, as applicable) in the most integrated setting appropriate. Finally, the policy or guidelines governing requests for reasonable modifications should also be clearly stated on the DOE website.

*     *     *

We request that the City provide a response to this findings letter, including an outline and timeline of the corrective actions the City intends to undertake to begin to remedy its lack of compliance with the ADA, within 30 days. We look forward to your continued cooperation with this investigation.[10]

Sincerely,

PREET BHARARA
United States Attorney

By: *Lara Eshkenazi*

LARA K. ESHKENAZI
JEANNETTE A. VARGAS
Assistant United States Attorneys
Tel.: (212) 637-2758/2678

Attachment

---

[10] Please note that this Letter of Findings is a public document and will be posted on the website of the United States Attorney's Office and at www.ada.gov.



**The University of the State of New York**
The State Education Department
Teacher Tenure Hearing Unit
EBA Room 981
Albany, New York 12234

Ph:  (518) 474-3021
Fax:  (518) 402-5940

(05/12)

## Hearing Request/Waiver for Education Law §3020-a Charges

| Instructions to the Tenured Employee: | This form is for you to request a hearing on the Education Law §3020-a charges brought against you, or to waive your right to a hearing such charges. You must return this form within 10 days of receipt of the charges to the Clerk or Secretary of the Board of Education that brought charges against you. If you fail to request a hearing or waive your right to a hearing within 10 days, you will be deemed to have waived your right to a hearing on the charges and your employing board will meet to determine a penalty. |
|---|---|

### Tenured Employee Information

| Name | Berta Morales | Phone | |
|---|---|---|---|
| Address | 800 E 149 St | Phone | |
| Address | 3C | Fax | |
| City, State Zip | Bronx, NY 10455 | Email | |

### Hearing Request or Waiver
*(Please check one)*

| ☒ | I request a hearing on the charges served against me pursuant to Education Law §3020-a |
|---|---|
| | **Please send Hearing Request to:** Regina Lopez / 28-11 Queens Plaza North Rm 408 / Long Island City, New York 11101 |
| ☐ | I waive the right to have a hearing pursuant to Education Law §3020-a. I understand the Board of Education will meet to determine the case and fix the penalty or punishment, if one is to be imposed. |

### Tenured Employee Attorney Information
*(Please complete this section if you will be represented by an attorney. The attorney will be authorized to receive all correspondence on your behalf)*

| Firm Name | | | |
|---|---|---|---|
| Attorney Name | R. Casagrande | Phone 1 | |
| Address | 52 Broadway | Fax | |
| City, State, Zip | New York, NY 10004 | Email | nyc3020A@nysutmail.org |

### Tenured Employee Signature

| Signature | *Berta Morales* | Date | 9/12/13 |
|---|---|---|---|



**The University of the State of New York**
The State Education Department
Teacher Tenure Hearing Unit
EBA Room 981
Albany, New York 12234

Ph:  (518) 474-3021
Fax:  (518) 402-5940

(06/12)

## Education Law §3020-a Charge Transmittal Form

| Instructions: | The District Clerk or the Secretary of the Board of Education must file this form via fax or mail with the Education Department when the Board of Education has found that there is probable cause to bring charges against a tenured educator.  A copy of the Notice of Probable Cause and the Charges voted on by the Board must be transmitted with this form. |
|---|---|

### Tenured Employee Information

| Name | Berta Morales | SSN | 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 |
|---|---|---|---|
| Address | 800 E 149 St | DOB | 03/02/1974 |
| Address | 3C | | |
| City, State, Zip | Bronx, NY 10455 | | |

### School District Information

| District Name | 09X070 - P.S. 70 | | |
|---|---|---|---|
| Address | 1691 Weeks Ave | Phone 1 | |
| Address | | Phone 2 | |
| City, State, Zip | Bronx, NY 10457 | Fax | |
| Contact Name | Principal Kerry Castellano | Email | |

### Charge Information

| Date Charges Filed: | September 10, 2013 | Date of Executive Session: | |
|---|---|---|---|
| Charge Detail: | Please see attached Specifications | | |

| Nature of Charges: (Check all that apply) | [ ] Immoral Character | [ ] Lack of Certification | [X] Incompetence |
|---|---|---|---|
| | [ ] Misconduct | [X] Conduct Unbecoming | [X] Neglect of Duty |
| | [X] Insubordination | [ ] Corporal Punishment | [ ] Sexual Harassment |

### School Attorney Information

| Firm Name | New York City Department of Education | | |
|---|---|---|---|
| Attorney Name | Rishona Fleishman, Esq. | Phone 1 | 212-374-6888 |
| Address | 49-51 Chambers Street, Room 611 | Fax | 212-374-9298 |
| City, State, Zip | New York, New York 10007 | Email | |



**The University of the State of New York**
The State Education Department
Teacher Tenure Hearing Unit
EBA Room 981
Albany, New York 12234

Ph:  (518) 474-3021
Fax:  (518) 402-5940

(06/12)

## Notice of Determination of Probable Cause on Education Law §3020-a Charges

| Instructions: | This Notice must be served on the tenured employee along with a copy of the Education Law §3020-a charges, the Rights of Tenured Employees form and the Hearing Request/Waiver form. |
|---|---|

### Tenured Employee Information

| Name | Berta Morales |
|---|---|
| Address | 800 E 149 St |
| Address | 3C |
| City, State, Zip | Bronx, NY 10455 |

### Notice to Tenured Employee

| Date Charges Filed: | September 10, 2013 | Date of Executive Session: | |
|---|---|---|---|

Please be advised that at a meeting in executive session on  the above date the school district identified herein has found that there is probable cause for Education Law §3020-a charge(s) against you.  The specific charges are attached to this form.  Within ten (10) days of receipt of these charges, you must elect to request a hearing before an impartial hearing officer, or waive your right to such a hearing. Should you fail to so request or to waive your right to a hearing within the specified ten days, the district clerk or the secretary of the board of education will notify both you and the Commissioner of Education that a waiver has been deemed to have occurred and that the board of education will meet to determine the case and fix the penalty or punishment, if one is to be imposed.

### School District Information

| District Name | 09X070 - P.S. 70 | | |
|---|---|---|---|
| Address | 1691 Weeks Ave | Phone 1 | |
| Address | | Phone 2 | |
| City, State, Zip | Bronx, NY 10457 | Fax | |
| Contact Name | Principal Kerry Castellano | Email | |

### Authorized Signature

| Name | *Kerry Castellano* | Date | 9/10/13 |
|---|---|---|---|

**Bylaws of the**
**Panel for Educational Policy**
**of the Department of Education of the**
**City School District of the**
**City of New York**

**PREAMBLE**

The Board of Education of the City of School District of the City of New York is created by the Legislature of the State of New York and derives its powers from State law.

The thirteen member body designated as the Board of Education in section 2590-b of the Education Law shall be known as the Panel for Educational Policy. The Panel for Educational Policy is a part of the governance structure responsible for the City School District of the City of New York, subject to the laws of the State of New York and the regulations of the State Department of Education. Other parts of the structure include the Chancellor, superintendents, community and citywide councils, principals, and school leadership teams. Together this structure shall be designated as the Department of Education of the City of New York.

The members of the Panel for Educational Policy are appointed according to law as follows: one member is appointed by each Borough President and eight members are appointed by the Mayor.  Each Borough President's appointee shall be a resident of the borough for which the borough president appointing him or her was elected and shall be the parent of a child attending a public school within the City School District.  Each mayoral appointee shall be a resident of the city and two mayoral appointees shall be parents of a child attending a public school within the City School District.  The parent members shall be eligible to continue to serve on the City Board for two years following the conclusion of their child's attendance at the public school.  The Chancellor shall serve as a non-voting ex-officio member of the Panel for educational Policy. The Panel shall also include two non-voting student advisory members selected by the Chancellor's High School Advisory Council. All members serve at the pleasure of the official who appointed them.

A vacancy on the Panel for Educational Policy shall, by law, be filled by appointment by the appropriate Borough President or the Mayor within 90 days of such vacancy.

The Bylaws of the Panel for Educational Policy set forth rules by which the Panel governs the conduct of its official business and affairs.

**ARTICLE 1**

## Members of the Panel for Educational Policy

## Section 1.1 Members and Officers

The Panel for Educational Policy shall elect its own Chairperson and Vice Chair from among its voting members.

The Chairperson shall preside at all meetings of the Panel for Educational Policy and perform all duties assigned to him/her by law and these Bylaws;

The Chairperson shall appoint all committees except as otherwise determined by the Panel for Educational Policy, and the Chairperson and Vice Chair shall be non- voting ex officio members of all committees;

The Panel for Educational Policy shall appoint a Secretary of the Panel who is not an appointed member of the Panel but who shall otherwise exercise the powers and duties conferred to him or her by these Bylaws.

The Chancellor is the chief executive officer and Superintendent of the City School District and shall have such powers and duties as are prescribed by law. He/she shall have a seat on the Panel for Educational Policy and the right to speak, but not to vote, on all matters before the Panel.

The Chancellor shall have custody of the corporate seal;

Nothing in these Bylaws shall be construed to affect the powers and duties conferred by law directly on the Chancellor as the chief executive officer and Superintendent of the City School District.

## 1.1.1 Absence or disability of the Chairperson or Vice Chair

In the event of the absence or disability of the Chairperson, the Vice Chair shall perform the duties of Chairperson.

In the event of the absence or disability of both the Chairperson and the Vice Chair, the Secretary shall call the roll, and on the appearance of a quorum, shall call the Panel to order, when the Panel shall elect a chairperson pro tempore to perform the duties as Chairperson with regard to presiding at that meeting.

## Section 1.2        Panel Members – Functions

The members of the Panel for Educational Policy shall perform those duties and have those responsibilities assigned to them by Education Law 2590-g, including the responsibility to advise the Chancellor on matters affecting the welfare of the city school district and its pupils.


## Section 1.3 Non-Voting Student Advisory Members

Non-voting student advisory members shall consist of two high school students selected by the Chancellor's High School Student Advisory Council. The advisory members may attend all public meetings of the Panel for Educational Policy but shall have no vote. The terms of the non-voting student advisory members shall begin on July 1st and end on June 30th of the following year.

## Section 1.4 Committees of the Panel for Educational Policy

### 1.4.1 Appeals Committee

When an appeal is filed pursuant to pursuant to sections 2590-g, 2590-l, and 2590-i(2)(a) of the Education Law, the Chairman of the Panel for Educational Policy may appoint an appeals committee to hear appeals and make recommendations to the full Panel.

### 1.4.2. Contracts Committee

The Chairperson of the Panel for Educational Policy shall appoint a Contracts Committee which shall be responsible for reviewing contracts proposed by the Chancellor and making recommendations to the full Panel.  The Contracts Committee shall be comprised of three Panel members appointed by the Mayor, two Panel members appointed by Borough Presidents, and a non-voting designee of the Chancellor who shall be responsible for providing information to the Contracts Committee regarding proposed contracts to come before the Panel.

### 1.4.3. Other Committees

The Panel for Educational Policy may have additional committees which shall be appointed by the Chairperson in accordance with these Bylaws. Committees of the Panel for Educational Policy may include advisory members of the committee with no voting rights. An advisory member(s) may be affiliated with the public, private, or non-profit sectors.

## Section 1.5 Secretary-Functions

### 1.5.1 Secretary's appointment and duties.

The Secretary of the Panel for Educational Policy shall:

• have charge of the books, papers and documents of the Panel for Educational Policy;

• prepare the agenda for each meeting of the Panel for Educational Policy;

• keep the minutes of the Panel for Educational Policy and such other minutes as the Panel for Educational Policy may direct;

• make minutes of all Panel regular meetings available to the public, including via the City Board's official internet website, in a timely manner but no later than the subsequent regular Panel meeting.

• review and process in accordance with appropriate directives all appeals to the Panel for Educational Policy filed in accordance with law, and be the clerk of the appeal board in accordance with regulations of the Commissioner of Education, part 113; and

• perform such other duties as the Chairperson and the Panel shall require including providing appropriate follow-up information as requested within a reasonable time of the request.

### 1.5.2 Secretary's absence

When the Secretary is not present at any meeting, the Secretary's duties shall be performed by a designee of the Chairperson.

## ARTICLE 2

### Meetings

## Section 2.1 Types of Panel for Educational Policy Meetings

Meetings shall be open to the public except to the extent permitted by law. The Panel for Educational Policy may adjourn a meeting or recess a meeting by agreement of a majority of those members attending a meeting. Upon announcing an adjournment or a recess, the Chairperson shall also announce an estimated date and/or time for reconvening the Panel for Educational Policy into public session.

### 2.1.1 Calendar Meetings

The Panel shall hold at least one public meeting per month. These meetings are held to take official action, in public, on matters for which the Panel for Educational Policy is responsible. At calendar meetings, business shall be the consideration of the resolutions, communications and other appropriate matters as described in the agenda accompanying the meeting notice. No other matters shall be considered except by consent of a majority of the members present.

At calendar meetings the Chairperson shall ensure that there is a sufficient period of time to allow for public comment on any topic on the agenda prior to a vote by the Panel.

### Notice of Calendar Meetings

At least ten business days in advance of calendar meetings, notice of the time, place and agenda for such meetings shall be publicly provided, including via the Panel for Educational Policy's official internet web site, and circulated to all

community superintendents, community district education councils, community boards and school leadership teams.

**Agenda for Calendar Meetings**

The agenda for each calendar meeting shall be comprised of a list and brief description of the subject matter being considered and identification of all items subject to a Panel vote.  The agenda for each calendar meeting shall also include the name, office, address, email address, and telephone number of a City District Representative, knowledgeable about the agenda, from whom any information may be obtained and to whom written comments may be submitted concerning agenda items.

### 2.1.2 Public Agenda Meetings and Public Hearings

These meetings are held to encourage maximum participation of the general public in the work of the Panel for Educational Policy. At these meetings, the Panel listens to the views of the public. These meetings may proceed without a quorum present. No votes are taken at these meetings.

These meetings shall be called at the discretion of the Chairperson.

### 2.1.3 Special Calendar Meetings and Adjourned or Recessed Meetings

Special calendar meetings may be held on the call of the Chairperson.  Where possible, written notice of such meeting shall be given to each Panel member not less than twenty-four (24) hours in advance of the meeting, but in any event shall be provided as soon as practicable, and shall state the matters to be considered. No other matters may be considered at such meetings except with the consent of all members present. Meetings may be reconvened to continue the work of an adjourned or recessed meeting.

### 2.1.4 Change in Date or Time and Cancellation of Meetings

A meeting of the Panel for Educational Policy may be changed to a stated date and time at the direction of the Chairperson.

### 2.1.5 Place and Time of Meetings

All calendar meetings of the Panel for Educational Policy and public agenda meetings shall be held at a place to be determined by the Chairperson.

At least one regular public meeting shall be held in each borough of the City of New York per year.

The Panel for Educational Policy shall consider appropriate public accommodations when selecting a venue so as to maximize participation by parents and the community.

### 2.1.6 Notification

The Secretary shall notify all members of the postponement or cancellation of any regular meeting or the calling of any special meeting or the holding of any adjourned or recessed meeting.

## Section 2.2   Quorum

A majority of the members of the Panel for Educational Policy shall constitute a quorum at all meetings of the Panel for Educational Policy. If a smaller number than the majority is present, the Secretary shall call the roll, record the names of the absentees and adjourn.

The Panel for Educational Policy shall act at its calendar and special meetings by a majority of the whole Panel for Educational Policy.

The Panel for Educational Policy shall act at executive sessions to the extent permitted by law by a majority of the whole Panel.

A committee of the Panel for Educational Policy shall act at committee meetings by a majority of the committee, to the extent permitted by law.

## Section 2.3   Parliamentary Procedures

The Chairperson shall decide all questions of order and procedure, for which the Chairperson shall refer to Roberts Rules of Order as he or she deems necessary.

At the calendar meeting the Secretary will read the heading of every resolution on the calendar. If no one attending the meeting wishes to address a particular resolution, it will be voted on the first reading.

When a question is put, every member present shall vote thereon, unless excused by the Panel. The minutes of the meeting shall reflect the vote of each member present and at the request of any member the roll of those present shall be called for the purpose of recording the yeas and nays.

If the Panel for Educational Policy does not complete the business items of a calendar meeting, the Chairperson may adjourn or recess the meeting to a specified date and time, or instruct the Secretary to reschedule the unfinished business at the next regular calendar meeting or at a special meeting.

## Section 2.4 Construction of Calendar

All resolutions requiring Panel for Educational Policy action shall be submitted to the Secretary at least five days in advance of the deadline for the provision of public notice of the meeting, as described in Section 2.1.1 of these Bylaws.

Except as otherwise provided by law, an emergency adoption of an item proposed pursuant to Education Law 2590-g(1) shall remain in effect for 60 days, during which time the Panel for Educational Policy shall comply with the public review process described in Section 2.5 of these Bylaws in order for the adopted item to become permanent.

Emergency adoptions of items relating to school closures or significant changes in school utilizations shall remain in effect for six months.  During this time the Panel shall comply with the process described in Section 2.5 of these Bylaws in order to extend the school closure or change in school utilization beyond the six month period.

## Section 2.6    Minutes

Minutes of calendar meetings shall be made publicly available, including via the Panel for Educational Policy's official internet web site, in a timely manner but no later than the subsequent calendar meeting.

## ARTICLE 3

## Bylaws

### Section 3.1 Adoption-Amendment-Repeal

Bylaws shall be adopted, amended or repealed by vote of the majority of the Panel for Educational Policy and in accordance with the requirements of Education Law 2590-d.

### Section 3.2 Suspension

Bylaws may be suspended as to a particular instance or matter, but not in general, on the vote of a majority of the full membership attending a public calendar or special meeting of the Panel for Educational Policy. Only those suspensions so enacted and recorded in writing shall have official status as representing the position of the Panel for Educational Policy.

## ARTICLE 4

## Personnel

### Section 4.1 Sabbatical Leaves of Absence

Sabbatical leaves of absence with pay may be granted by the Chancellor to eligible personnel in accordance with policies of the Panel for Educational Policy. For community school districts, the community superintendent may grant such leaves in accordance with policies of the Panel and regulations of the Chancellor.

f)    the allocation of projected revenues among community districts and their schools pursuant to Education Law 2590-r(a) and the aggregation of the community district budgets pursuant to 2590-r(f);

g)    a procurement policy for the City District and any amendments made thereto; and

h)    proposals for all school closures or significant changes in school utilization.

The public review process shall include notice of the proposed item under Panel consideration at least 45 days in advance of the Panel vote on such item. Such public notice shall include a description of the subject and the purpose and substance of the proposed item under consideration, and shall otherwise conform to the requirements of Education Law 2590-g(8)(a).

For purposes of this section, amendments of proposed items described in subsections (c) and (d) above do not include correction of typographical or grammatical errors, changes of contact information, and reformatting of documents.

## 2.5.2    Notice of Revisions

In the event that an item proposed to the Panel pursuant to 2590-g is substantially revised after public notice has been provided, the Panel for Educational Policy shall issue a revised public notice. Such revised notice shall be issued at least 15 days before a Panel vote on the proposed item, but in no event shall the Panel vote on the proposed item within 45 days from the date of the initial public notice. Notice of the revised item shall otherwise conform to the requirements of Education Law 2590-g(8)(b).

## 2.5.3    Assessment of Comments

Following the public review process, the Secretary shall make available to the public, including via the Panel's official internet web site, an assessment of the public comments concerning the item under consideration prior to 24 hours before the Panel vote on such item. The Secretary shall conduct such assessment in accordance with Education Law 2590-g(8)(c).

## 2.5.4    Emergency Adoptions

In the event that the Panel for Educational Policy or the Chancellor determines that immediate adoption of any item requiring Panel approval is necessary for the preservation of student health, safety or general welfare and that compliance with the public review process described in Section 2.5 of these Bylaws would be contrary to the public interest, such proposed item may be adopted on an emergency basis in accordance with the procedures set forth in Education Law 2590-g(9).

Except as otherwise provided by law, Panel members may request that items be placed on the calendar by notifying the Secretary in writing no later than two business days prior to the deadline for provision of public notice of the meeting. If, however, a Panel member makes such a request after the two day deadline but at any time prior to the upcoming calendar meeting, the Chairperson shall respond to the request at any time prior to that meeting.

If a member of the Panel for Educational Policy requests that an item be placed on the calendar at a calendar meeting, the Chairperson shall take a vote of the Panel members regarding whether such item shall be added to the calendar. An item may be added to the calendar at the meeting by majority vote of those present.

Any item which is not submitted in accordance with these procedures may be withheld by the Secretary and will appear on the calendar for the subsequent meeting.

Items may only be included on the agenda as provided by these Bylaws.

To the extent practicable, the Secretary shall deliver the agenda for each business meeting along with all available supporting materials to each member of the Panel for Educational Policy at least ten (10) business days in advance of the meeting, except in the case of a special meeting called under extenuating circumstances when materials shall be delivered at least twenty-four (24) hours in advance.

## Section 2.5   Public Review Process

### 2.5.1   Notice and Comment Period

The Panel for Educational Policy shall undertake a public review process prior to approving the following proposed items pursuant to Education Law 2590-g(1):

a)   standards, policies and objectives proposed by the Chancellor directly related to educational achievement and student performance;

b)   standards, policies, and objectives as specifically authorized or required by state or federal law or regulation;

c)   regulations proposed by the Chancellor and the Panel and any amendments made thereto;

d)   the educational facilities capital plan, and any amendments requiring Panel approval, pursuant to Education Law 2590-p;

e)   annual estimates of the total sum of money which the Panel deems necessary for the operation of the City District and the capital budget, pursuant to Educational Law 2590-q;

Such sabbatical leaves may be terminated by the Chancellor or community superintendent prior to the initially established expiration dates thereof.

Such sabbatical leaves may be canceled by the Chancellor or community superintendent when the application for cancellation is received prior to the first school day of the period of such leave.

## Section 4.2 Removal-Suspension-Trial of Charges

### 4.2.1 Charges

Charges may be preferred against any employee for:

unauthorized absence from duty or excessive lateness;

neglect of duty;

conduct unbecoming his/her position, or conduct prejudicial to the good order, efficiency or discipline of the service;

incompetent or inefficient service;

violation of the Bylaws, rules or regulations of the board of education; or

any substantial cause that renders the employee unfit to perform his/her obligations properly to the service.

### 4.2.2 Trial of Charges-Classified Employees

The Chancellor or the Chancellor's designee shall initiate charges against an employee in the classified service in accordance with Civil Service Law, section 75.

### 4.2.3 Trial of Charges-Charges

An employee against whom charges have been preferred shall in person, or by counsel or representative, be entitled before the hearing to be furnished a copy of the charges and specifications, and shall be entitled to participate in person, by counsel or representative, in the trial of the charges, to cross-examine opposing witnesses and to call and examine witnesses in his/her own behalf. The preferral of charges against an employee shall not prevent the inclusion in the trial of additional charges and specifications, provided the employee is informed thereof.

### 4.2.4 Default or Waiver by Employee

If a pedagogical employee waives the right to a hearing pursuant to a section 3020-a of the State Education Law, the Panel for Educational Policy or the

10

community superintendent, as applicable, shall proceed to determine the case and fix the penalty or punishment, if any to be imposed, in accordance with section 3020-a of the State Education Law.

### 4.2.5 Decision on Charges After Trial

1) Teaching and Supervisory Staff

Within thirty days of receipt of the report of the section 3020-a hearing panel, or as soon thereafter as practicable the Chancellor or the community superintendent, as applicable, shall implement the panel's recommendations. An appeal of the findings and recommendations of the hearing panel may be taken in accordance with section 3020-a of the State Education Law.

2) Classified Employees

The report of a trial committee or trial examiner shall be subject to final action by the Chancellor who shall, before acting, review the testimony and the evidence in the case. The reasons and factual basis for the decision shall be summarized in the Chancellor's final decision.

## 4.3 Reviews related to Ratings and/or Recommendations re Probationary Service of Pedagogical Personnel

### 4.3.1 Appeals re Ratings

Any person in the employ of the City School District who appears before the Chancellor, or a committee designated by the Chancellor, the size and composition of which the Chancellor is to determine, in respect to an appeal from a rating of an other than a satisfactory rating or an NR rating shall be afforded the opportunity for review in the manner set forth herein and in procedures established by the Chancellor.

A committee designated by the Chancellor shall summon the appellant as soon as practicable, but in any event not later than one year from the date of the receipt of the rating by the appellant.

The findings and recommendations of the committee shall be submitted to the Chancellor for a final decision.

### 4.3.2 Appeals re Discontinuance of Probationary Service

Any person in the employ of the City School District who appears before the Chancellor, or a committee designated by the Chancellor, concerning the discontinuance of service during the probationary term, or at the expiration thereof, shall have a review of the matter before a committee which shall be designated in accordance with contractual agreements covering employees or by

regulations of the Chancellor, as appropriate. After the review, the committee shall forward its advisory recommendation to the community superintendent or to the Chancellor in accordance with contractual agreements.

### 4.3.3 Committee Reviews

Any person who appears before a committee for the purpose of appealing a rating or concerning the discontinuance or denial of completion of probationary service or denial of certification or termination of a pedagogical license issued by or on behalf of the City School District to a non-tenured employee shall receive written notice of the time and place of the review, addressed either to the place of employment or to the last known post office address, at least one week before the date specified for said review. The notice shall inform the person that he or she is entitled to appear in person, to be accompanied and advised by an employee of the City School District or a representative of the union recognized by the Panel for Educational Policy as the collective bargaining representative for the employee, to be confronted by witnesses, if any, to call witnesses, to examine exhibits and to introduce any relevant evidence.

If a witness who was summoned or requested to appear is unavailable or unwilling to appear despite the best efforts of the committee, this shall not prevent a review from continuing but shall be one of the factors considered by the committee.

The advisor need not be an attorney. The attendance of such advisor and witnesses, if employees of the City School District, shall not be deemed absence from official duty, but such persons shall not absent themselves from school duty except pursuant to such rules as the chancellor shall prescribe.

No employee of the City School District shall serve as an advisor or panel member in more than two (2) matters in a school year nor request or accept directly or indirectly any remuneration or other consideration for service as adviser or witness.

A sound recording shall be kept of the proceedings and the person who is appearing before the committee for the purpose of appealing a rating or concerning the discontinuance or denial of completion of probationary service or denial of certification shall be entitled to receive a duplicate of the sound recording of the review, at cost, upon written request. In the event that the sound recording equipment is not available or breaks down during the review, minutes shall be taken of the proceedings and such minutes shall be available to the person summoned at cost and upon reasonable written notice.

Nothing herein shall preclude witnesses from appearing at review proceedings by teleconference or other technological means.

Employees who are not entitled to a review of a u-rating, who timely appeal the decision to terminate their license or certificate, shall have the decision to

terminate their licenses or certificates reviewed in accordance with the procedures contained in Chancellor's Regulation C-31. Those procedures shall be deemed to be incorporated herein, and witnesses may also appear by teleconference or by other technological means.

## Section 4.4 Retirement

Retirement of employees of the City School District shall be in accordance with applicable provisions of laws and rules and regulations pertaining to the retirement system of which such employee is a member. An employee of the City School District shall submit to a medical examination by the medical board of the retirement system of which he/she is a member when requested to do so, pursuant to an application of the Chancellor in accordance with applicable law or regulations pertaining to such retirement system after examination by and recommendation of the medical division. Neglect, refusal or failure to submit to such medical examination shall be deemed an act of insubordination.

# ARTICLE 5

## Appeals

### Section 5.1          Rules

All appeals to the Panel for Educational Policy shall be served on the person designated by the Chancellor to receive such appeals. The Chancellor shall be authorized to establish and publish appropriate rules for the processing of appeals.

# ARTICLE 6

## Contracts and Settlements

### Section 6.1  Contracts

The Chancellor shall present contracts to the Panel for Educational Policy for its approval in the following circumstances:

- where the contract is let by a procurement method other than competitive sealed bidding pursuant to Education Law 2590-h;

- where the contract provides for technical, consultant or personal services;

- where the value of the contract exceeds or projects an annual expenditure exceeding one million dollars; or

- where the value of a contract awarded to a single entity exceeds one million dollars annually.

### Section 6.2 Settlements

Prior to approving the settlement of litigation where the settlement would significantly impact the provision of educational services or programming within the City School District, the Chancellor shall present the proposed settlement to the Panel for Educational Policy for its approval.

THE STATE EDUCATION DEPARTMENT
THE UNIVERSITY OF THE STATE OF NEW YORK


In the Matter of
NEW YORK CITY DEPARTMENT OF EDUCATION
v.
BERTA MORALES
Section 3020-a Education Law Proceeding (File #23,051)


DATE:              March 6, 2014

TIME:              11:00 a.m. to 2:00 p.m.

LOCATION:          NYC Department of Education
                   Office of Legal Services
                   49-51 Chambers Street
                   New York, NY 10007

BEFORE:            DONALD T. KINSELLA, ESQ.
                   HEARING OFFICER

INDEX

APPEARANCES:

FOR THE COMPLAINANT:

    A. HYUN RICH, ESQ., of Counsel
    NYC Department of Education
    Office of Legal Services
    49-51 Chambers Street
    New York, NY 10007
    Telephone: (212) 374-6741

FOR THE RESPONDENT:

    DEBRA WABNIK, ESQ.

---

**BERTA MORALES - 03/06/14**

1    (The hearing commenced at 11:00 a.m.)
2        THE HEARING OFFICER: Okay. This is the
3   matter of the Department of Education of the City of
4   New York versus Berta Morales, the Respondent. Could
5   I have the appearances for the record, please?
6        MS. A. HYUN RICH: A. Hyun Rich, A. H-Y-U-N,
7   last name, R-I-C-H, representing the Department of
8   Education for the City of New York. With me is Harlyn
9   Griffenberg, H-A-R-L-Y-N, last name, Griffenberg, G-R-
10   I-F-F-E-N-B-E-R-G, the Department's Disciplinary
11   Investigator.
12        MS. DEBRA WABNIK: Debra Wabnik, Stagg,
13   Terezi, Confusione & Wabnik, attorney for the
14   Respondent, Berta Morales.
15        MS. BETSY COMBIER: Betsy Combier, paralegal
16   for the Respondent.
17        MS. BERTA MORALES: Berta Morales, the
18   Respondent.
19        THE HEARING OFFICER: Good morning.
20        MS. WABNIK: Good morning.
21        THE HEARING OFFICER: Okay. We're here for
22   the preliminary conference on this matter. Could you
23   give us some idea of the status, Ms. Rich?
24        MS. RICH: Before we need to go to a

---

INDEX

W I T N E S S E S

Name:       Page:

E X H I B I T S

RESPONDENT     DESCRIPTION    I.D.   IN EV.
DEPARTMENT OF EDUCATION   DESCRIPTION    I.D.   IN EV.

2

---

5

**BERTA MORALES - 03/06/14**

1   preliminary, a pre-hearing conference, my
2   understanding is there is an outstanding Motion to
3   Dismiss filed by Respondent. So, we should address
4   that first.
5        THE HEARING OFFICER: Okay. We can address
6   that. You've submitted the, a motion--
7        MS. WABNIK: Yes.
8        THE HEARING OFFICER: --Ms. Wabnik.
9   Anything else to add to that?
10        MS. WABNIK: I haven't had any opposition,
11   so…
12        THE HEARING OFFICER: Well, do you have
13   anything else to add advocating for the motion?
14        MS. WABNIK: Besides what's already in here?
15        THE HEARING OFFICER: Um-hm.
16        MS. WABNIK: No, not at this time. But not
17   having heard any opposition, I'm sure I would if I had
18   opposition to it.
19        THE HEARING OFFICER: Well, so you have
20   nothing to add to the paperwork is what you're saying.
21        MS. WABNIK: Not at this time, no.
22        THE HEARING OFFICER: Okay. Ms. Rich,
23   what's your response to the motion?
24        MS. RICH: Yes. So, going to start with

6

BERTA MORALES - 03/06/14

1   some basic jurisprudence. And in the--going to start with
2   Federal Court and I know it's not applicable here, but
3   just by way of example. So, in the Federal Court system,
4   there are District Courts located throughout the country.
5   And if there's an adverse decision in the District Court,
6   there's an opportunity to appeal that decision to the
7   Circuit Courts and there are a certain number of Circuit
8   Courts of Appeals located in the United States. And then,
9   if there's an adverse decision in the Appellate Court,
10  whatever Circuit, you can appeal that to the Supreme Court
11  of the United States, located in Washington. Here, in New
12  York, just up the street from us, is the Southern District
13  of New York. That would be the District Court. And if
14  you had an adverse decision in the Southern District of
15  New York, you would appeal it to the Second Circuit, also
16  just right up the street from us. And then, that's when
17  you would go to Washington, to the Supreme Court. State
18  Court is similar, but they're called different things.
19  Here the trial level Court in New York State is Supreme
20  Court for the State of New York. Each county has its own.
21  Again, New York County's is located just up the street.
22  If you receive an adverse decision from the Supreme Court,
23  it's appealed to the Appellate Division. Appellate
24  Division actually is not located up the street. For the

7

BERTA MORALES - 03/06/14

1   First Department, which includes New York County, that's
2   located up by the Flatiron District. And then, beyond
3   that, after the Appellate Division, if you have an adverse
4   decision, you go to the Court of Appeals. Now, when you
5   have mandatory arbitration, as you do in our case, there's
6   a certain procedure you need to follow. And 3020-a
7   states, Education Law Section 3020-a(5) states "Not later
8   than 10 days after receipt of the Hearing Officer's
9   decision, the employee or the employing Board may make an
10  application to the New York State Supreme Court to vacate
11  or modify the decision of the Hearing Officer pursuant to
12  Section 7511 of the Civil Practice Law and Rules." And
13  then, "Court's review shall be limited to the grounds set
14  forth in such section." So, CPLR 7511, vacating or
15  modifying an arbitrator award, "Grounds for vacating, (b)
16  The award shall be vacated on the application of a party
17  who either participated in the arbitrator or was served
18  with a notice of intention to arbitrate, if the Court
19  finds the right of that party were prejudiced by
20  corruption, fraud or misconduct in the procuring of the
21  award or partiality of an arbitrator appointed as a
22  neutral, except where the award was by confession or an
23  arbitrator or agency or person making the award exceeded
24  his powers or so imperfectly executed it that a final and

8

BERTA MORALES - 03/06/14

1   definite award upon the subject matter submitted was not
2   made or failure to follow the procedure of this Article,
3   unless the party applying to vacate the award continued
4   with the arbitrator with notice of the defect and without
5   opposition--objection." So, we're clear on what the
6   appeal process is; State Court system in the State of New
7   York, Federal Court system in the United States. There is
8   not one case Respondent can cite to that supports her
9   argument that you, as the neutral in this case, have no
10  jurisdiction. Full stop. Not one case. There's not one
11  case in Federal Court, ever. Full stop. Not one case in
12  State Court supports Respondent's argument. Full stop.
13  Can you imagine what would happen to an attorney if they
14  brought a case to a District Court, where the Circuit
15  Court has already ruled on this decision? Can you imagine
16  what would happen in State Court, a lawyer brought a case,
17  in Supreme Court and the Appellate Division has already
18  ruled on that matter? So, let's take it a step back.
19  Here, we have an arbitration, where the State Supreme
20  Court has already ruled on this issue and has rejected
21  Respondent's argument, fully, completely and totally. And
22  you will not find one reference in Respondent's papers
23  that distinguish any of the cases that state that you, as
24  the Arbitrator, have jurisdiction over this case. Simply

9

BERTA MORALES - 03/06/14

1   wishing that the law were applied differently does not
2   mean it's going to happen. And yet, that is what
3   Respondent is asking you to do. Real cases, with real
4   Westlaw citations and everything, give you the case of
5   Malcolm Menchin, 2011 W.L. 276 4349, petitioner claims
6   that the probable cause finding was improper because it
7   was made by the principal of the school and not the
8   "employing Board of Education in executive session." The
9   Court finds that the Chancellor did have the authority to
10  issue the delegation, pursuant to Education Law Sections
11  2590-h(38) and (19). And it goes on to state that the
12  Court finds that Section 2590-h(19) of the Education Law
13  is very broad and has no such limits in its text. And
14  they're trying to say that oh, but the Chancellor's powers
15  is limited in the subsection. No, it's not. And let me
16  explain why. Because in 259-h(38), it's all about the
17  Chancellor's powers in New York City, okay. That's all it
18  does. That's all it addresses. Powers and duties of the
19  Chancellor. Chancellor has a power and duty to exercise
20  all the duties and responsibilities of the employing board
21  as set forth in Section 3020-a of this chapter with
22  respect to any member of the teaching or supervisory staff
23  of schools under the jurisdiction of the community and
24  district's education councils. The Chancellor shall

10

BERTA MORALES - 03/06/14

1   exercise all such duties and responsibilities for all
2   community districts or may delegate the exercise of all
3   such duties and responsibilities to all of the community
4   superintendents of the city district.  Malcolm Menchin,
5   Court rejected.  The Court.  Westlaw citation and
6   everything.  This argument was rejected.  The Chancellor
7   has the power to delegate his authority.  Malcolm Menchin
8   isn't good enough, let me give you Soleyn, S-O-L-E-Y-N,
9   and Menchin is M-E-N-C-H-I-N.  Again, talking about
10   employing board in executive session and argues that
11   because it's not, it's delegated to the principal, that
12   there's no authority.  The Department maintains that due
13   process was not violated because -- then-Chancellor Joel
14   Klein delegated, pursuant to Education Law Section 2590-h,
15   the power to initiate and resolve disciplinary charges
16   against teaching and supervisory staff members who have
17   completed probation to all high school principals.  The
18   delegation is attached as an exhibit.  The Respondent, the
19   teacher, concedes, generally, that delegation is
20   permissible, but maintains because Education Law 3020-a
21   refers to the employing board in executive session and not
22   just the employing board, power to initiate charges cannot
23   be delegated.  However, petitioner cites no cases to
24   support this argument.  And Education Law 2590-h does not

11

BERTA MORALES - 03/06/14

1   make this distinction.  Pretty straightforward.  No case
2   law.  In a more recent case, we have Sheryl White-Grier,
3   W-H-I-T-E hyphen G-R-I-E-R.  Petitioner presents many
4   arguments as to why the award should be vacated and also
5   acknowledges that this Court is limited in its review
6   power.  She argues that the arbitration proceeding was
7   based on a legal nullity and the arbitrator lacked subject
8   matter jurisdiction.  She points out that under the
9   Education Law, charges against her were first to
10   have been presented to the City's Board of Education for a
11   final finding of probable cause as set forth in Education
12   Law Section 3020-a(2) or since she taught in the New York
13   City schools, charges should have been presented to the
14   community superintendent pursuant to Education Law Section
15   2590-h(38), providing that in New York City, the school's
16   Chancellor may delegate the responsibility to his
17   superintendents.  Here, however, the principal of her
18   school had, himself, issued the probable cause finding and
19   she argues this voided the safety feature embedded in the
20   Education Law that protects tenured employees by providing
21   that they will be brought up on charges only after a
22   neutral entity has found probable cause.  This argument
23   was made to Hearing Officer Berg, who dismissed it.  He
24   reasoned that the principal of the school would logically

12

BERTA MORALES - 03/06/14

1   be the Department employee with enough knowledge to find
2   probable cause and the superintendent should be free to
3   rely on the principal's finding.  He opined that nothing
4   suggests that because the legislator provides that a
5   Chancellor may, under Education Law Section 2590-h(38),
6   delegate any or all of the duties and responsibilities set
7   forth in Education Law Section 3020-a to the community
8   superintendents, that no other delegation of this duty is
9   allowed.  Petitioner argues that a principal has no
10   statutory authority to sign the finding of probable cause
11   as this is a responsibility that rests with the Chancellor
12   in New York City or with superintendents.  This argument
13   has been unsuccessfully presented to other trial level
14   Courts in recent years.  And citing cases.  Consistently,
15   the Courts have read these statutes to mean that a
16   district superintendent may delegate to a principal the
17   responsibility of preferring charges.  This issue's been
18   settled.  It's done.  It's over.  There is not one case
19   Respondents can cite to that supports their argument.  Not
20   one.  The fact that they couldn't even manage to
21   distinguish the cases that have already been issued and
22   are relied upon as good law in New York State is
23   objectionable on its face, because that's what lawyers do.
24   That's what a first-year law student is taught, that you

13

BERTA MORALES - 03/06/14

1   respect the process.  You respect the Court system.  When
2   you disagree with an opinion, you appeal it.  And until
3   that opinion is reversed, it is good law.  Again, can you
4   imagine what would happen if you went to Federal Court and
5   tried to argue something in District Court that had
6   already been decided by the Circuit Court of Appeal?  Even
7   in New York State, even if you'd brought a case a State
8   Supreme Court and it had already been decided by the
9   Appellate Division, what would happen?  There is
10   absolutely no reason for you to reserve decision on this
11   issue.  It's been determined by the State Supreme Court,
12   not in New York County, but the Menchin case is actually
13   in Rockland County.  Not one case can support them.
14   That's why you need to deny this Motion to Dismiss and we
15   can move forward with the pre-hearing.  Thank you.
16       THE HEARING OFFICER:  Just one quick
17   question for you.  The cases that you cited, were they
18   proceedings that were brought after a full hearing or were
19   those cases where someone had--
20       MS. RICH:  [Interposing] It was--
21       THE HEARING OFFICER:  --sought a writ of
22   mandamus, in essence?
23       MS. RICH:  It was after a full hearing was
24   brought.

14

1   BERTA MORALES - 03/06/14
2   THE HEARING OFFICER: Okay. Thank you.
3   MS. RICH: And I might further add that any
4   possible due process violation, this is not the forum.
5   THE HEARING OFFICER: Ms. Wabnik?
6   MS. WABNIK: Well, first of all, all the
7   cases that she's citing are, as she said, trial Court
8   cases, State Supreme cases. They are not binding on each
9   other and they're, at best, persuasive to each other.
10  This is not the equivalent of an Appellate Division having
11  made a decision and then, going into the Supreme Court and
12  asking for something completely different, as she said.
13  Second of all, not one of those cases deals with Education
14  Law 256--2566, which provides that the Chancellor does not
15  have the power to vote. There is an inherent discrepancy
16  between saying the Chancellor can delegate the power to
17  vote and the Chancellor doesn't have the power to vote.
18  The fact that there isn't a specific case law that
19  addresses this issue doesn't change the fact that
20  statute, itself, provides that this cannot happen. So, we
21  would go then to basic statutory construction. We just
22  had a little, I'm not sure why, lesson in how the Court
23  system works. I'm not going to give you a lesson on
24  statutory construction, except to say that we, obviously,
25  don't allow a statute to be rendered completely worthless.

15

1   BERTA MORALES - 03/06/14
2   That's not the way it works. So, these cases have not
3   addressed this issue and do not reconcile the fact that
4   the Chancellor doesn't have the authority to vote.
5   THE HEARING OFFICER: Isn't 2566 about
6   Boards of Education in City school districts, other than
7   the City of New York?
8   MS. WABNIK: I don't believe so, no.
9   THE HEARING OFFICER: Okay. Anything else?
10  I do have a question from your papers. You seem to talk
11  about mandamus. If I don't have the authority to act, how
12  do I have the authority to rule that I don't have the
13  authority to act?
14  MS. WABNIK: Well, it's not even a question
15  of having any authority to rule. You shouldn't be going
16  forward in this particular case. We shouldn't even be
17  here. I mean, this whole explanation that we had about
18  how everybody delegates to everybody else, it doesn't
19  explain why, in the notice of determination, it says that
20  a meeting was held in executive session on the above date
21  and the school district identified found that there was
22  probable cause. Nobody said this form had to be used.
23  The date of executive session is blank. If you want to
24  say the principal decided, on his or her own, that these
25  charges were going to be preferred against you pursuant to

16

1   BERTA MORALES - 03/06/14
2   such and such a statute, then put it in here. Put it in
3   the notice because this notice is completely ineffective.
4   It's not true. This didn't happen. So, to have us here,
5   based on notice of something that didn't even happen, is
6   inherently improper.
7   THE HEARING OFFICER: Okay. Well, this is a
8   form that's created by the State of New York, which is
9   generic or geared towards the entire state. The fact that
10  the form referred to a meeting and executive session,
11  obviously, refers to Boards of Education, however hundred
12  there are in New York State, that do follow this process.
13  Section 2590-h(38) of the Education Law very clearly
14  authorizes the Chancellor to act as the Board and also
15  authorizes, specifically with respect to 3020-a
16  proceedings, and authorizes--the Chancellor is authorized
17  to delegate duties.
18  MS. WABNIK: Assuming that to be true, then
19  the Chancellor--
20  THE HEARING OFFICER: [Interposing] Well, if
21  that's true--
22  MS. WABNIK: --still had to--
23  THE HEARING OFFICER: --then what is your
24  argument?
25  MS. WABNIK: It's the--

17

1   BERTA MORALES - 03/06/14
2   THE HEARING OFFICER: [Interposing] The
3   Chancellor's delegated the duties. It's a 3020-a
4   proceeding. There is no -- . Everybody knows that. And
5   he's delegated the duties and the charges have been filed.
6   MS. WABNIK: The Chancellor didn't have the
7   authority to delegate the right to vote.
8   THE HEARING OFFICER: The Chancellor--
9   MS. WABNIK: [Interposing] He can't give
10  what he doesn't have.
11  THE HEARING OFFICER: The Chancellor has the
12  authority to act as the Board.
13  MS. WABNIK: Well then, the Chancellor--
14  THE HEARING OFFICER: It says.
15  MS. WABNIK: --should have had an executive
16  session, which had to be part of an open meeting.
17  THE HEARING OFFICER: Well, I assume that,
18  first of all, it wasn't the Chancellor, since obviously he
19  delegated it--
20  MS. WABNIK: [Interposing] Okay. Then the
21  principal--
22  THE HEARING OFFICER: --but whoever the
23  person is--
24  MS. WABNIK: --whoever the principal was--
25  THE HEARING OFFICER: --may well--

18

1       BERTA MORALES - 03/06/14
2           MS. WABNIK:  --but this--
3           THE HEARING OFFICER:  --have had an
4   executive meeting in their mind when they decided to bring
5   the charges.
6           MS. WABNIK:  Well, that doesn't comply with-
7   -
8           THE HEARING OFFICER:  But it's--
9           MS. WABNIK:  --3020.
10          THE HEARING OFFICER:  --it's clear that
11  Section 2590-h of the Education Law contemplates that
12  charges of this nature in the City of New York are going
13  to be brought by a determination of the Chancellor or his
14  or her delegate.  And that's what has occurred.  So, your
15  motion is denied.  And we can, on that basis, the case law
16  is interesting, but the statute is pretty specific.  So,
17  let's proceed with the preliminary conference.
18          MS. RICH:  Just one final matter of
19  housekeeping.  I'm handing to you copies of the
20  delegations by Chancellor Wolcott, who was Chancellor at
21  the time these charges were preferred and the second page
22  is the delegation by the community superintendent to the
23  principals within that school district.  Going forward to
24  the pre-hearing conference in this matter, at the same
25  time that the charges were served against Respondent, the

19

1       BERTA MORALES - 03/06/14
2   Respondent was also provided with a copy of the
3   Anticipatory Bill of Particulars.  This document sets
4   forth the supporting materials that were used to come up
5   with the charges within the Specifications, as well as a
6   preliminary list of possible witnesses that will be called
7   by the Department.  The Department has already provided
8   some documentation from Respondent's file, as it is
9   maintained at the school, to Respondent's attorney.  The
10  Department is aware that its discovery obligations are
11  ongoing.  And we'll also seek to determine whether is
12  additional documentation at the school that might be
13  maintained by the supervisors and administrators.  The
14  Department does request reciprocal discovery at the
15  appropriate time.  And at this time, I think that it would
16  be best to close out the pre-hearing with the exception of
17  determining dates.
18          MS. WABNIK:  We actually have specific
19  discovery demands that we are serving today.
20          MS. RICH:  Okay.  Discovery demands are
21  supposed to be served five days in advance of the pre-
22  hearing conference.  The Department will accept them, but
23  just wants to note for the record that there is a policy
24  and procedure with respect to discovery demands in cases
25  such as this.  And it should have been served last week.

20

1       BERTA MORALES - 03/06/14
2           THE HEARING OFFICER:  Well, that's correct.
3   I appreciate that you've accepted it and obviously, you--I
4   don't know what's in the demands.  You don't know because
5   you haven't seen them.  So, if there are remaining
6   discovery disputes, we can deal with that at the time that
7   we deal with scheduling the hearing.  Do you have anything
8   to add?
9           MS. WABNIK:  No.
10          THE HEARING OFFICER:  Okay.  Well, the
11  hearing then will be adjourned, subject to scheduling the
12  actual hearing.  This is several cases down my list, in
13  terms of trying to do the cases in chronological order to
14  when they were filed.  And I'm not sure that we will reach
15  it by June.  It's unlikely.  But there are at least 10 or
16  12 cases ahead of this, I believe.
17          MS. RICH:  Yes, I believe this is number
18  nine on your list.
19          THE HEARING OFFICER:  Oh, nine.  Okay.  So,
20  well, we may reach it by June.  You never know.  But I
21  can't give you a date right now.  So, we'll put this off.
22  And again, if there are items that you believe you're not
23  being provided with, we can address that.  And I'll
24  address it, despite the fact it should have been filed
25  last week.  We'll address the substance of the issue.

21

1       BERTA MORALES - 03/06/14
2           MS. WABNIK:  Okay, appreciate that.
3           THE HEARING OFFICER:  Anything further?
4           MS. RICH:  Nothing further from the
5   Department.
6           THE HEARING OFFICER:  Okay.  Thank you.
7   We're going off.
8           (The hearing adjourned at 2:00 p.m.)
9
10

22

# CERTIFICATE

I, DeeDee E. Tataseo do hereby certify that the foregoing typewritten transcript of proceedings in the matter of New York City Department of Education v. Berta Morales, File No. 23,051 was prepared using the required transcription equipment and is a true and accurate record of the proceedings.

Signature:

Date:    March 13, 2014

23

Student Index

[None]



**Department of Education**
*Dennis M. Walcott, Chancellor*

**Corrected Notice and Agenda**
August 14, 2013

# PUBLIC MEETING OF THE PANEL FOR EDUCATIONAL POLICY

**Murry Bergtraum High School for Business Careers**
**411 Pearl Street**
**New York, NY 10038**
**Wednesday, August 21, 2013**
**6:00 PM**

## AGENDA

**I. Executive Session**

    A. Executive Session regarding Matter Pertaining to Employee Discipline: Inquest on Employee Termination [NOTE: This is closed to the public and will take place prior to the 6:00PM public meeting start time.]

**II. Regular Public Meeting**

    A. Chancellor's Update

    B. Approval of Annual Estimate of the Total Sum of Money Available to Support DOE Operations (see here)

    The Panel will vote on the attached total sum of money necessary to support DOE operations. Public comment on this item will take place before the Panel votes.

    C. Approval of Revised Formulas Used to Allocate Revenue Among Community School Districts and Schools (see here)

    The Panel will vote on the attached revised formulas used to allocate revenue among community school districts and schools. Public comment on this item will take place before the Panel votes.

    D. Approval of Revised Chancellor's Regulations (see here)

    The Panel will vote on the attached amendments to Chancellor's Regulations. Public comment on items being considered by the Panel will take place before the Panel votes.

E.  Approval of Contracts (see here)

The Panel will vote on the attached list of contracts. Public comment on contracts being considered by the Panel will take place before the Panel votes.

F.  General Public Comment

Sign Up For Public Comment

Speaker sign-up for agenda items II.B through II.E will begin at 5:30PM at the door and will close at 6:30PM  Each speaker will be allowed two minutes to speak during the public comment portions of the meeting.

Interpretation services will be provided in Spanish. American Sign Language will be provided through reservation only: (212) 374-4946 or panel@schools.nyc.gov.

### 

Contact for agenda items: (212) 374-5472, 52 Chambers Street, New York, NY 10007

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND

-----------------------------------------------------------------X   DCM PART 3

In the Matter of the Application of
ROSALIE CARDINALE,                                                   **Present:**
                                        **Petitioner,**

                                                                     Hon. Desmond Green, J.S.C.

   -against-
                                                                     **DECISION AND ORDER**

THE NEW YORK CITY DEPARTMENT OF                                      Index No. 85165/2017
EexEDUCATION
                                        **Respondent.**              **Motion No. 3228-001**
                                                                                **4596-002**

-----------------------------------------------------------------X

The following papers numbered 1 to 6 were marked fully submitted on February 21, 2018:

|  | Numbered |
|---|---|
| Notice of Petition and Verified Petition and Exhibits (dated August 9, 2017)…………………………………………… | 1 |
| Notice of Cross-Motion to Dismiss made by Respondent (dated November 8, 2017)…………………………………………... | 2 |
| Affidavit of Ms. Laura C. Williams (admission pending) in Support of Respondent's Cross-Motion to Dismiss with Exhibits Attached (dated November 8, 2017) ………………………………………….. | 3 |
| Memorandum of Law in Support of Respondent's Cross-Motion to Dismiss (dated November 8, 2017) …………………………………………. | 4 |
| Combined Affidavit and Memorandum of Law in Opposition (dated November 29, 2017) …………………………………………... | 5 |
| Reply Affidavit of Ms. Laura C. Williams (admission pending) in Support of Respondent's Cross-Motion to Dismiss (dated December 4, 2017) …………………………………………….. | 6 |

Upon the foregoing papers, the Verified Petition (001) seeking the modification of the Arbitrator's Opinion and Award to, *inter alia*, restore Petitioner to her position within the Department of Education is granted. This Court denies the cross-motion made by Respondent,

Department of Education (hereinafter "DOE") seeking the dismissal of Rosalie Cardinale's verified petition.

## FACTS

The DOE employed Petitioner, Rosalie Cardinale as a special education teacher for 17 years. Petitioner spent the last 15 years of her employment with the DOE at Public School 55 The Henry M. Boehm School (hereinafter "P.S. 55"). Cardinale received satisfactory observations up to the 2013-2014 school year when the DOE adopted the Advance System which uses the Danielson Framework for Teaching. The DOE issued Charges and Specifications (hereinafter "Specifications") pursuant to Education Law § 3020-a for misconduct during the school years 2013-2014, 2014-2015, 2015-2016, and 2016-2017 through Howard Friedman, General Counsel to the Department of Education by Jessica Wolff-Fordham on February 27, 2017.[1] The caption referenced Rosalie Cardinale, but the body of the Specifications detailed the DOE's allegations against "Jane Smith."

The Specifications alleged Petitioner: 1) failed to properly, adequately, and/or effectively plan and/or execute separate lessons, as observed by school administrators on thirteen observation dates, 2) showed a lack of professionalism and poor judgment, 3) neglected her duties, and 4) failed to implement directives and recommendations for improvement.

Petitioner's counsel sought dismissal of the charges against Cardinale arguing the DOE failed to abide by the statutory framework for the removal of a tenured teacher for cause. Petitioner

---

[1] The Introduction to the "Specifications" reads as follows: "The Board of Education of the City of New York, also known as the New York City Department of Education, brings this action pursuant to Education Law § 3020-a against **Jane Smith** for her failures in the nature of incompetent and inefficient services, misconduct, neglect of duty, and unwillingness and/or inability to follow procedures and carry out normal duties during the 2013-2014, 2014-2015, 2015-2016, and 2016-2017 school years." (emphasis added)

argued the DOE failed to conduct an executive meeting of the employing board to find probable cause to conduct a hearing before issuing the Specifications against Petitioner. Hearing Officer Michael A. Lendino rejected Petitioner's motion to dismiss the Section 3020-a Education Law Proceeding. Hearing Office Lendino provided reasoning for his denial in the Opinion and Award where he found the Board of Education Chancellor in the City School District of New York may delegate the authority to conduct an executive meeting by the employing board on probable cause to District Superintendents who may then delegate the same authority to local school principals. Hearing Officer Lendino determined further, without citation to any evidence, that Chancellor Carmen Farina delegated her authority to the District Superintendents who in turn delegated it to local principals.[2]

This Court reviews a record which remains unclear concerning whether the local principal or district superintendent determined probable cause existed justifying the allegations levied against Petitioner to warrant an Education Law § 3020-a hearing. The record, however, makes clear an Education Law § 3020-a proceeding took place on the following dates: April 25 and 26, and May 18, 23, 24, and 31, 2017 before Hearing Officer Lendino.

Hearing Officer Lendino considered testimony given by Petitioner, Principal Sharon Fishman (hereinafter "Fishman"), the principal of P.S. 55, and Assistant Principal Paul Giordano (hereinafter "Giordano"), also from P.S. 55 when he rendered his Opinion and Award. The

---

[2]   HO Lendino cited *Pina-Pena v. New York City Dept. of Educ.*, 2014 N.Y. Misc. LEXIS 1630, 2014 NY Slip Op 30893 (U), NY Sup. Ct., Apr. 9, 2014, to demonstrate the delegation of authority from the Chancellor to subordinate employees. The facts of *Pina-Pena*, however, concern a 3020-a Education Law Proceeding taking place in September and November 2012 under former Chancellor Dennis Wolcott not Chancellor Carmen Farina.

testimony given by Fishman and Giordano received additional support from ten informal observation reports and three formal observation reports.[3]

Hearing Officer Lendino issued an Opinion and Award on July 27, 2017.  The Opinion and Award contained the following findings relating to Specifications 1 and 4:

> **Specification 1**: During the 2013-2014, 2014-2015, 2015-2016 and 2016-2017 school years, [Petitioner] failed to properly, adequately and/or effectively plan and/or execute separate lesson[s] as observed on or about each of the following dates:
>
> a.  April 10, 2014;
> b.  May 29, 2014;
> c.  November 10, 2014;
> d.  January 20, 2015
> e.  February 25, 2015;
> f.  May 18, 2015;
> g.  October 8, 2015;
> h.  May 11, 2016;
> i.  May 26, 2016;
> j.  June 1, 2016;
> k.  September 27, 2016;
> l.  November 16, 2016; and/or
> m.  January 17, 2017
>
> **Specification 4**:  [Petitioner] failed during the 2013-2014, 2014-2015, 2015-2016 school years to fully and/or consistently implement directives and/or recommendations for pedagogical improvement and professional development provided in observation conferences with administrators and/or outside observers; instructional meetings; teacher improvement plans; one-on-one meetings with administrators, school-based coaches, and/or outside observers; as well as school-wide professional development with regard to:
>
> a.  Proper planning, pacing, and/or execution of lessons;

---

[3]     The combined number of observation minutes over the four school years at issue yielded 362 minutes (6.03 hours) of observation.  Of the total 362 minutes observed during four school years, 110 minutes or 1 hour and 40 minutes came through formal observations.  The observation report indicates a formal observation involved either Fishman or Giordano observing a full class period.  The formal observation reports, however, indicate three different "full period" times of 30 minutes, 35 minutes, and 45 minutes.  The formal observation reports also fail to document what constitutes a "period" for students taught by Cardinale in kindergarten through second grade.

    b.  Using appropriate methods and/or techniques during lessons;
    c.  Designing coherent instruction;
    d.  Using assessment in instruction; and/or
    e.  Using appropriate questioning and discussion techniques.

Hearing Officer Lendino's Opinion and Award found Cardinale's dismissal from service was an appropriate penalty.

Cardinale commenced this Article 75 proceeding challenging the Opinion and Award dismissing her from service arguing, *inter alia*, significant procedural and substantive deficiencies existed in the hearing process which interferes with the public policy concerning the protection of teachers tenure. Petitioner argues the procedural violations require this Court to restore her status as a DOE employee at P.S. 55.

The DOE cross-moves to dismiss Cardinale's verified petition arguing that it fails to state a cause of action and to confirm the arbitration award under CPLR § 7511(e).

## DISCUSSION

I.    *Petitioner Demonstrates Procedural Deficiencies Exist Requiring This Court to Vacate The Arbitration Award for Violation of Strong Public Policy and the Opinion and Award Was Irrational On Its Face*

A court shall vacate an arbitration award when it finds either (1) corruption, fraud, or misconduct, (2) the partiality of an arbitrator, or (3) an award which is made in excess of the arbitrator's enumerated powers prejudiced a party's rights (*see* CPLR 7511 [b] [i]-[iii], *Matter of Meehan v. Nassau Community College*, 242 AD2d 155, 157 (2d Dept 1998). Court of Appeals case law provides an arbitration award may also be vacated where it is irrational or violative of strong public policy (*see, Town of Callicoon v. Civil Serv. Emples. Ass'n, Inc.*, 70 NY2d 907 [1987], *Matter of United Fedn. Of Teachers, Local 2, AFT, AFL-CIO v Board of Educ. Of City School Dist., of City of N.Y.*, 1 NY3d 72 [2003]).

A. *The Opinion and Award Stripping Petitioner of Tenure and Terminating Her Employment Is Irrational*

The Supreme Court of the United States held the Constitution does not create property rights, "[r]ather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. 564, 577 [1972]. New York State created the public school tenure system guaranteeing continued employment to tenured teachers by statute and therefore created a property right in a tenured teacher's continued employment. (*See Education Law* §§§ 3012, 3012-a, 3020, *Holt v. Board of Educ. of Webutuck Cent. School Dist.*, 52 NY2d 625 [1981], *Matter of Abromvich v. Board of Educ. of Cent. School Dist. No. 1 of Towns of Brookhaven & Smithtown*, 46 NY2d 450 [1979]). Where a property right in continued employment exists, such as New York's tenure system, the recipient of such a right may not be deprived without due process. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 [1985].

New York State guarantees a tenured teacher's due process rights to continued employment by statute requiring that "no [tenured teacher] … shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article or in accordance with alternate disciplinary procedures contained in a collective bargaining agreement…" *Education Law* § 3020.

The statutory procedural process afforded to teachers with tenure under *Education Law* § 3020-a requires:

- The filing of charges "in writing and filed with the clerk or secretary for the school district or employing board during the period between the actual opening and closing of the school year for which the employed is normally required to serve. *Education Law* § 3020-a(1)

- "Within five days after receipt of charges, the employing board, in executive session, shall determine, by a vote of a majority of all the members of such board, whether probable cause exists to bring a disciplinary proceeding against the employee  pursuant to this section." *Education Law* § 3020-a(2).

- Where an employing board determines probable cause exists for discipline the tenured teacher shall receive: "a written statement specifying (i) the charges in detail, (ii) the maximum penalty which will be imposed by the board if the employee does not request a hearing or that will be sought by the board if the employee is found guilty of the charges after a hearing and (iii) the employee's rights under this section, shall be immediately forwarded to the accused employee...." *Id.*

Here, Petitioner's counsel sought dismissal of the charges against Petitioner at the outset of the hearing.  Counsel argued before Hearing Officer Lendino, and now before this Court, that the DOE's failure to submit the charges against Petitioner to the employing board to determine whether probable cause existed constitutes a procedure defect depriving Hearing Officer Lendino of jurisdiction to consider the charges.  Hearing Officer Lendino rejected Petitioner's argument, but this Court does not.

The argument raised by the DOE opposing Petitioner's original motion before Hearing Officer Lendino, and again before this Court, insisting the statutory framework does not require probable cause determination by the employing board before an Education Law § 3020-a hearing is unavailing.  The DOE reasons the Chancellor wields the statutory power to "exercise all the duties and responsibilities of the employing board... [and] shall exercise all such duties and responsibilities for all community districts or may delegate the exercise of all such duties and

responsibilities to all of the community superintendents..." *Education Law* § 2590-h[38].[4]  In turn, the community superintendents may delegate any powers and duties conferred upon them to any subordinates, in this case, local principals. (*See Education Law* § 2590-f[1][b]). The DOE, however, fails to provide this Court with evidence demonstrating the office of the Chancellor delegated any of its duties and responsibilities to the community superintendents. Similarly, the DOE fails to provide any evidence showing a delegation of duties and responsibilities from the community superintendents to the local principals.

The cases cited by the DOE demonstrate a court's analysis begins with considering evidence indicating the office of the Chancellor transferred responsibilities and duties to subordinate administrators. *See Pina-Pena v. New York City Dept. of Educ.*, 2014 NY Slip Op 30893(U), Sup Ct. NY Cty, Apr. 9, 2014, (finding "the Chancellor [Wolcott] delegated the relevant authority to the District Superintendent who, in turn, delegated her authority to local school principals"); *Matter of Haas v. New York City Bd./Dept. of Educ.*, 35 Misc3d 1207(A), Sup Ct. NY Cty, Apr. 4, 2012 (finding "[o]n August 19, 2002, the chancellor [Klein] delegated 'to the community school district superintendents the authority to prefer charges against tenured pedagogical employees pursuant to Education [Law] section 3020-1... On August 27, 2007 ... the community superintendent of community school district 29...delegated to each principal of a school within the district the power to '[i]nitiate and resolve charges against teaching ... staff members in your school who have completed probation'"); *Matter of Roberts v. Department of Educ. of the City of New York*, 3 NYS3d 287, Sup Ct. NY Cty, Oct. 8, 2014 (finding "On April 19, 2011, Chancellor Dennis M. Walcott delegated...the power to initiate and resolve disciplinary

---

[4]      *Education Law* § 2590-h(19) provides additional authority allowing the Chancellor to "[d]elegate any of his or her powers and duties to such subordinate officers or employees as he or she deems appropriate and to modify or rescind any power and duty so delegated."

charges against teaching and supervisory staff members to community school district superintendents"). There exists no evidence in the record before this Court supporting the transfer of any duties and responsibilities from the office of the Chancellor to any subordinate administrator.[5]

Absent a demonstration by the DOE that the Office of the Chancellor delegated powers to subordinate administrators to unilaterally commence a hearing under *Education Law* § 3020-a Hearing Officer Lendino had any authority to consider the charges levied against Petitioner. Hearing Officer Lendino conducted the *Education Law* § 3020-a hearing based on unproven assumptions that the delegations of duties and responsibilities from the office of the Chancellor to subordinate administrators occurred in compliance with the relevant statutory authority.

Indeed, Respondent fails to counter arguments raised in this Petition and provide evidence, administrative rules, or executive orders, or similar pronouncement of the exercise of executive authority, indicating Chancellor Farina delegated her duties and responsibilities to subordinate administrators. Notwithstanding the low standard needed to demonstrate the rationality of an Opinion and Award, the fact that the Hearing Officer failed to consider a basic jurisdictional predicate before conducting the hearing renders the entire decision irrational because his authority to conduct the hearing is suspect.

B. *The Opinion and Award Violates New York's Strong Public Policy Protecting Teacher's Tenure*

The Court of Appeals speaking on the necessity of teacher's tenure stated:

---

[5]     This Court also notes that while the office of the Chancellor may exercise the power of the employing board and delegate the same to subordinate administration officials, it does not appear obligatory. *See Matter of Norgrove v. Board of Educ. of City School Dist. of City of N.Y.*, 23 Misc3d 684, Sup. Ct. NY Cty., Jan. 13, 2009 [finding in 2007 the Board of Education and not the office of the Chancellor, or its designee, issued a "Notice of Determination of Probable Causes on Charges Brought Against Tenured School District Employee"]

[tenure] is a legislative expression of a firm public policy determination that the interests of the public in the education of our youth can best be served by a system designed to foster academic freedom in our schools and to protect competent teachers from the abuses they might be subjected to if they could be dismissed at the whim of their supervisors. In order to effectuate these convergent purposes, **it is necessary to construe the tenure system broadly in favor of the teacher, and to strictly police procedures which might result in the corruption of that system** by the manipulation of the requirements for tenure...

*Ricca v. Board of Education*, 47 NY2d 385, 391 (1979) (emphasis added). This Court reasons the same strict policing applied to the procedure granting tenure to teachers apply equally to the procedures applied when a school district seeks the removal of a teacher's tenure. (*See Holt v. Board of Ed. of Webutuck Central School Dist.*, 52 NY2d 625, 632 [1981] [finding "[t]he purpose of the statute [*Education Law* § 3020-a] is to protect teachers from arbitrary imposition of formal discipline"])

Petitioner argues, correctly, the Education Law requires a finding "whether probable cause exists to bring a disciplinary proceeding against an employee" (*Education Law* § 3020-a[2]). There exists no statutory language indicating the statutes permitting the delegation of duties and responsibilities from the employing board to the office of the Chancellor eliminated the precondition of a finding of "probable cause" before subjecting a tenured teacher to the disciplinary hearing anticipated under *Education Law* § 3020-a. Indeed if the DOE properly demonstrated the office of the Chancellor delegated its duties and responsibilities to subordinate administrators, there exists no evidence showing a determination that probable cause existed supporting the allegations against Petitioner.

The DOE's failure to make a finding of probable cause and adhere to the procedural protections guaranteed to Petitioner in *Education Law* § 3020-a violates Petitioner's due process rights and violates New York's strong public policy protecting the integrity of the tenure system.

The hearing conducted before Hearing Officer Lendino, therefore, is a nullity. (*See Sanders v. Board of Educ. of City School Dist. of City of New York*, 17 AD3d 682 [2d Dept 2005], *Morgan v. Board of Educ. of City of New York*, 201 AD2d 482 [2d Dept 1994]).

## CONCLUSION

Petitioner demonstrates the Opinion and Award rendered by Hearing Officer Lendino was both irrational and violative of New York's strong public policy protecting the property rights of tenured teachers.  The DOE may not abridge the due process protections afforded to tenured teachers. The DOE's analysis of the law, undeniably, dispenses with the various layers of checks and balances protecting a tenured teacher's Constitutionally protected property right in continued employment and places the decision concerning whether a disciplinary hearing is necessary into the hands of a single administrator.  The DOE's suggested framework ignores the various levels of administrative oversight put in place by the legislature to protect tenured teachers. This Court finds such a construction suspect on its face.  The DOE, however, failed completely to present evidence or other controlling authority indicating the statutory delegation of duties and responsibilities from the office of the Chancellor to subordinate administrators occurred.

This Court finds the DOE's interpretation of the statutory framework, even had they presented evidence permitting such delegations, runs afoul of the clear legislative intent.  The concentration of all disciplinary authority into the hands of a single local administrator creates the very "arbitrary imposition of formal discipline" the legislature sought to prevent when it enacted *Education Law* § 3020-a (*Holt v. Board of Ed. of Webutuck Central School Dist.*, 52 NY2d 625, 632 [1981]).

This Court finds the DOE's interpretation of the statutory framework, even had they presented evidence permitting such delegations, runs afoul of the clear legislative intent contained

in *Education Law* § 3020-a requiring different levels of the education administration apparatus to take part in the decision to discipline a tenured teacher. New York State public policy requires strict compliance with the procedural safeguards afforded to tenured teachers. The DOE's failure to conduct a probable cause analysis deprived Petitioner of her due process rights, thus violating New York's strongly held policy supporting the tenure system.

Accordingly, it is hereby:

ORDERED, that Rosalie Cardinale's Petition is granted in its entirety; it is further

ORDERED, that the Award and Opinion dated July 27, 2017 is vacated; it is further

ORDERED, that Rosalie Cardinale shall be reinstated effective immediately and entitled to full back pay from the date of termination; it is further

ORDERED, that Respondent's cross-motion is denied in its entirety; and it is further

ORDERED, that Petitioner shall settle judgment.

ENTER,

_____

Hon. Desmond Green, J.S.C.

DATED: March 29, 2018